DENNIS B. ARNOLD, SBN 70022, darnold@gibsondunn.com
JEFFREY C. KRAUSE, SBN 94053, jkrause@gibsondunn.com
PETER S. BACH-Y-RITA, SBN 267442, pbachyrita@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: 213.229.7000
Facsimile:  213.229.7520

Attorneys for Plaintiff Stark RM Eagle LLC

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>STRADELLA INVESTMENTS, INC., A CALIFORNIA CORPORATION,<br><br>Debtor.<br><br>---<br><br>STARK RM EAGLE LLC, A WISCONSIN LIMITED LIABILITY COMPANY,<br><br>Plaintiff,<br><br>- vs. -<br><br>RICHARD A. MARSHACK, AS CHAPTER 11 TRUSTEE OF STRADELLA INVESTMENTS, INC., A CALIFORNIA CORPORATION<br><br>Defendant. | CASE NO. 8:10-bk-23193-CB<br><br>Chapter 11<br>Adv. No. _____<br><br>**COMPLAINT FOR SPECIFIC PERFORMANCE,  DECLARATORY RELIEF, QUIET TITLE AND INJUNCTIVE RELIEF** |

Plaintiff STARK RM EAGLE, LLC a Wisconsin limited liability company ("Plaintiff" or, collectively with its affiliates, "Stark"), for its complaint, hereby alleges as follows:

### JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. Section 151, 157, and 1334.

2.    This adversary proceeding is brought pursuant to rule 7001, *et seq*. of the Federal Rules of Bankruptcy Procedure.

3.    Venue in the Court is proper pursuant to 28 U.S.C. Section 1409 as this adversary proceeding arises in and relates to a case under Title XI that is now pending in this District.

4.    This is a "core" proceeding as defined in subparagraphs (A), (B), (K), and (O) of 28 U.S.C. Section 157(b)(2). This adversary proceeding constitutes a "core" proceeding within each and all of subparagraphs (A), (B), (K), and (O) of 28 U.S.C 157(b)(2).

## THE PARTIES

5.    Plaintiff is a limited liability company organized and existing under the laws of the State of Wisconsin. Plaintiff is the record and beneficial owner of a sixty percent (60%) undivided interest as a tenant-in-common in certain real property located in the City of Rancho Mirage, County of Riverside, California, consisting of approximately 653 acres more particularly described on Exhibit "A" appended hereto (the "Property") and incorporated herein by this reference and hereby made a part hereof with the same force and effect as if set forth in full herein.

6.    Defendant Richard A. Marshack ("Defendant" or "the Chapter 11 Trustee") is the duly appointed Chapter 11 Trustee of the Bankruptcy Estate (the "Estate") of Stradella Investments, Inc. ("Stradella" or the "Debtor"), a California corporation, and the debtor in the above-captioned Chapter 11 reorganization case pending in this Court. The Court appointed Richard A. Marshack as the Chapter 11 Trustee of Stradella on or about March 29, 2013. During the period commencing upon September 29, 2010 and at all times thereafter until the appointment of Mr. Marshack as the Chapter 11 Trustee of Stradella, Stradella was a debtor and debtor-in-possession in the above-captioned Chapter 11 reorganization case pending in this Court. Each and all of the acts and conduct of the Debtor described herein took place prior to the appointment of the Chapter 11 Trustee. This Complaint and the facts alleged below relate primarily to the existence and scope of liens upon the Property claimed by the Estate and/or the Debtor and whether the Property is burdened by certain obligations in favor of the Estate.

Gibson, Dunn &
Crutcher LLP

**SUMMARY OF CLAIMS**

7.    Plaintiff provides the following brief summary of the events described in detail below to assist in understanding the complex nature of the transaction by which Stradella acquired a lien on a 60% undivided interest as a tenant-in-common in the Property and the nature of the claims plead herein:

8.    The Property is located in Rancho Mirage.  Plaintiff is the record and beneficial owner of a sixty percent (60%) undivided interest as a tenant-in-common in the Property.   Plaintiff acquired its interest in the Property at a trustee's sale in 2009.  In March of 2006, a sixty percent (60%) undivided interest in the Property was conveyed in a complex transaction in which Stradella received $25 million in cash, a $25 million promissory note (the "Stradella Note") secured by a deed of trust and the right to receive a chunk of future profits and revenue expected to be generated from development of the Property.  The buyer of the Property, RM Eagle, LLC, an entity entirely unrelated to Plaintiff, obtained a $43 million loan to fund the cash portion of the basic purchase price and future development expenses from Plaintiff's predecessor-in-interest.  Plaintiff acquired all interest in such third-party loan concurrently with its funding.  The loan held by Plaintiff was to be secured by a second-priority lien junior only to the lien of a deed of trust in favor of Stradella and the other sellers. The loan held by Plaintiff was also to be absolutely senior in payment and lien priority to all rights of Stradella to receive any part of the future profits.

9.    As a critical component of this complex commercial transaction, the Debtor executed an Intercreditor Agreement in which the Debtor expressly agreed  that no changes, no modifications, not even any "deferrals" could ever be made with respect to the Stradella Note secured by the first trust deed on the Property without the prior written consent of Plaintiff.  The Intercreditor Agreement provides, in relevant part, that the Debtor "… *shall not*, without the prior written consent of [Plaintiff], in its sole discretion, in each instance, enter into any amendment, deferral, extension, modification, increase, renewal, replacement, consolidation, supplement or waiver (collectively, a "First Loan Modification") of the …" Stradella Note.  The Debtor also expressly agreed that any so-called "First Loan Modification" made without Plaintiff's consent would *not* be senior to the lien held by Plaintiff to secure its $43 million loan.  As to future profits, the Debtor also agreed that repayment

of all components of the deferred purchase price would be absolutely subject and subordinate to repayment of the $43 million note held by Plaintiff and that the junior trust deed securing such future profits would forever rank junior to the lien held by Plaintiff.

10.    Despite the clear and unequivocal language in the Intercreditor Agreement negotiated by these sophisticated parties and their advisors over a period of months, Stradella repeatedly breached these restrictions upon modification of the First Loan Documents without Plaintiff's required consent.  Over a period of two years, the Debtor repeatedly altered the fundamental payment terms of the Stradella Note.  In May of 2006, barely six weeks after signing the Intercreditor Agreement, Stradella entered into the first of three so-called "First Loan Modifications" without obtaining the requisite consent of Plaintiff.  Stradella entered into the second of these three "First Loan Modifications" later in 2006, also without obtaining the requisite consent of Plaintiff.  The last of the three "First Loan Modifications" made by Stradella without obtaining the requisite consent of Plaintiff took place early in 2008.  As a result, under the express terms of the Intercreditor Agreement, the lien of the deed of trust held by Stradella to secure the Stradella Note became subject and subordinate to the deed of trust in favor of Stark to secure the $43 million loan.

11.    On April 30, 2013, the Chapter 11 Trustee filed a "Chapter 11 Status Report" (the "Status Report") in the Debtor's pending reorganization case.  In the Status Report, the Chapter 11 Trustee asserted the existence of two distinct claims that directly and adversely affect the Property and cloud title to the Property.  First, the Chapter 11 Trustee asserted the possible existence of an ongoing right of the Estate to a share of future income and profits generated by the Property.  There is no basis in fact or law for any claim by the Estate to any part of the future income and profits generated by the Property.  Contrary to the statements in the Status Report, all of the rights granted to the Debtor or otherwise held by the Estate to receive a share of future profits from the Property were absolutely subordinated to the lien of the deed of trust held and enforced by Plaintiff and thus extinguished by operation of law in March, 2009 when Plaintiff caused the completion of a trustee's sale on the 60% interest in the Property.  The Status Report and the incorrect assertions made therein with respect to the possible existence of an interest by the Estate in and to future income and profits

1  generated by the Property constitute a cloud upon the title to the interest in the Property held by

2  Plaintiff.

3      12.    Second, in the Status Report, the Chapter 11 Trustee states that Plaintiff "is the current

4  owner of the 60% tenant in common interest in the Property, *subject to the Note secured by the First*

5  *DOT.  (Emphasis added.*)" See, *Report, supra, page  7*.  The Status Report also states that "Under the

6  terms of the PSA and Note, the $25 million dollar Note starts to accrue interest on September 30,

7  2013".  See, *Report, supra, page 7-8*.  However, an interest accrual date of September 30, 2013

8  arises from a "First Loan Modification" entered into by Stradella in breach of the Intercreditor

9  Agreement, thereby rendering the lien of the "First DOT" held by Stradella subordinate to a trust

10  deed on the same collateral held by Plaintiff under the express terms of the Intercreditor

11  Agreement.   Plaintiff's subsequent exercise of the power of sale under the now-senior deed of trust

12  held by Plaintiff thus extinguished both the lien of the formerly "First DOT" in favor of Stradella and

13  any right of the Estate to enforce the payment of interest or any other obligation secured by such

14  inferior lien by operation of law upon the 60% interest in the Property now vested in Plaintiff.  Thus,

15  contrary to the Status Report, Plaintiff is the record and beneficial owner of a 60% tenant in common

16  interest in the Property free and clear of the "First DOT".

17

18              **FACTUAL BACKGROUND:**

19                  **PART I:**

20          **THE SALE OF THE PROPERTY**

21      13.    Plaintiff is informed and believes that Stradella is controlled by three brothers:

22  Abdollah, Abdolrahim and Abdolrashid Boroumand.  During the 1970s, the Boroumand family

23  purchased a 60% undivided interest in the Property.  Although title was vested at the outset in

24  individual family members, from 1978 to March 2006, record ownership of the Property was vested

25  in various entities, including Stradella, all of which Plaintiff is informed and believes were owned

26  and controlled by one or more of the three brothers.

27      *Marketing & Sale of the 60% Interest in the Property*

28

Gibson, Dunn &
Crutcher LLP

5

14.     On October 20, 2005, title to the 60% interest in the Property was transferred to EIMS-Stradella, L.P. ("EIMS-Stradella"), a California limited partnership.  EIMS-Stradella was then a newly formed entity in which Northwoods Corporation (itself then newly-formed too), was the sole general partner while Stradella and seven then-extant subsidiaries of Stradella were the limited partners.  Plaintiff is informed and believes that the transfer of the 60% interest in the Property to EIMS-Stradella was made in contemplation of the marketing and sale of the 60% interest in the Property to a third-party and to facilitate the intent of Stradella (& its predecessors) to structure any sale of the 60% interest in the Property as a sale of partnership interests rather than a conveyance of real property.

15.     EIMS-Stradella retained experienced counsel to represent its interests in this transaction, including sophisticated counsel with extensive experience in the structure and sale of real property in such manner as to minimize the payment of any taxes on the gains from such sales.  The EIMS-Stradella team included noted tax lawyer John Simon of Sheppard Mullin Richter & Hampton and Michael Karlin of Beverly Hills.  The ultimate buyer of the partnership interests in EIMS-Stradella was a newly formed Delaware LLC known as "RM Eagle, LLC (the "Buyer" or "RM Eagle") formed by well-known real estate developer Randall Bone of the Sunrise Company.  The Buyer also retained experienced counsel to represent its interests in this transaction, including sophisticated counsel with extensive experience in the structure and financing of real property, Greenberg Glusker.  These negotiations ultimately produced an extraordinarily complex agreement by which the general and limited partners of EIMS-Stradella (the "Sellers") transferred 100% of the partnership interests in EIMS-Stradella to RM Eagle in exchange for $25 million in cash, a $25 million promissory note and the right to share in future net income and profits generated by the 60% interest in the Property.  The Sellers also reserved the right to exercise rights typically reserved to an owner on an ongoing basis after closing, thereby establishing   a *de facto* joint venture.

*The PSA & the Purchase Price: $50 million Up-Front* plus *a Material Share of Future Net Income & Profits*

16.     The negotiations between the Buyer and EIMS-Stradella were lengthy and complex and lasted for several months during the winter of 2005-06.  In late February, 2006, the partners of

EIMS-Stradella and the Buyer opened an escrow for a sale of the 60% interest in the Property vested in EIMS-Stradella structured as a sale by the Sellers of their respective partnership interests in EIMS-Stradella pursuant to that certain Agreement For The Purchase And Sale Of Partnership Interests And Joint Escrow Instructions, dated "for identification purposes only as of February 21, 2006" (the "PSA").

17.    The PSA and its numerous exhibits is a long and complex document.  Independent of exhibits and signature pages to the PSA, the PSA itself is over 50 pages long with a 7-page Glossary of Terms which defines no less than 106 separate terms used in the PSA and its 22 exhibits.    The parties to the PSA went to great lengths to tailor the PSA and its terms to carefully express their intent and understandings with respect to the nature, terms and structure of the sale of the partnership interests in EIMS-Stradella to the Buyer.  The 22 exhibits to the PSA include several complicated agreements intended to allocate future proceeds from development or sale of the 60% interest in the Property between the Sellers and the Buyer and to carefully and precisely set forth the relative priority of a series of obligations and liens that were intended, from and after the closing, to affect the 60% interest in the Property.  A copy of the PSA (*without* the exhibits thereto) is appended hereto as Exhibit "B".

18.    The transaction contemplated by the PSA and its many exhibits was far more than a simple purchase and sale in which a seller conveys its interest in an asset for a set purchase price and no longer retains any interest or claim to the asset.  Here, by contrast, the Sellers bargained not only for the payment of a basic purchase price for the 60% interest in the Property of $50 million but the Sellers were also to receive, as a deferred part of the purchase price, a majority of all profits generated by any future sale of the Property and at least one-half of all net income generated by development and operation of the Property as a membership-based residential golf community.  In addition to the non-contingent and contingent amounts paid and to be paid as part of the purchase price for the Sellers's partnership interests, the Sellers also retained an interest in the 60% interest in a small part of the Property known as the "Commercial Parcel" to be held by the Buyer in trust for the Sellers.  The PSA and its various components and exhibits also granted a series of extraordinary *post-closing* rights to the Sellers with respect to the 60% interest in the Property, including the right

to market and cause the transfer of parts of the Property and the right to designate bidders for parts of the development work.

19.      Ultimately, the sheer complexity of the PSA and its exhibits is staggering.  Apart from the use of scores of definitions and the internal workings of the PSA itself with reference to the sale, the exhibits to the PSA included numerous substantive agreements between the Buyer and the Sellers. Some of these are complicated agreements that addressed the sharing of profits by the Sellers in the future development and/or sale of the Property in intricate detail.  Several of the exhibits consisted of complex documents that established the precise priorities between the liens and obligations arising in favor of the Sellers and the additional debt incurred by the Buyer to fund the $25 million down-payment, including a 35-page Intercreditor Agreement (with its own set of 47 definitions) governing the relative priority of that certain Long Form Deed of Trust and Assignment Rents recorded on March 14, 2006 as Instrument Number 2006-0181833, in favor of Stradella to secure payment of the $25 million promissory note (the "Stradella TD") to an unrelated deed of trust in favor of Plaintiff's predecessor and a separate Subordination and Standstill Agreement by which the Sellers absolutely subordinated all of its rights under the PSA, the Hotel Agreement, the Participation Agreement (with 44 separate definitions itself), a recorded Memorandum of Purchase Agreement and a Subordinate Long Form Deed of Trust and Assignment of Rents constituting a third-priority lien upon the 60% interest in the Property (the "Third TD").  Other exhibits consisted of forms to be used to terminate the memoranda recorded against the 60% interest in the Property upon the occurrence of future events.

20.      In addition to the complexity arising from the transaction itself and the veritable maze of documents created by the PSA and its exhibits, the other key theme running through these documents is that all of the key terms are embodied in private off-record writings.  Thus, even though two deeds of trust, an intercreditor agreement and numerous memoranda were recorded in the public records, *none* of those documents reveal the substantive terms of the many agreements executed by the parties to the PSA at closing in March, 2006.  Virtually every one of the exhibits to the PSA uses terms defined in the PSA or in other exhibits.  Without the PSA, many of these substantive agreements are difficult to construe or understand.  Some, such as the purchase-money note for the

Buyer's obligation to pay the remaining $25 million of the basic purchase price, are almost useless in isolation because the terms that govern *when* payments are to become due are all defined solely in the PSA.  Thus, the ability to which any of the agreements can be enforced or even construed independently of the PSA or the other exhibits to the PSA is limited.

21.    The parties to the PSA clearly expected that the development of the Property would generate significant net cash flow to be split between the Buyer and the Sellers.  These revenue streams were elaborately allocated between the Sellers and the Buyer by a series of several agreements appended as exhibits to the PSA, each of which are summarized below.

*The Participation Agreement*

22.    The PSA and its exhibits allocated a massive share of all future income from the Property as well as all proceeds generated from sales of golf club memberships, home sites, residential dwellings, lots and any hotel developed on the Property.  Thus, under that certain Participation Agreement, dated for identification as of February 21, 2006, appended to the PSA as Exhibit "E" (the "Participation Agreement") and executed as part of the closing of the sale of the partnership interests in EIMS-Stradella, the Sellers were entitled to receive as part of the purchase price, after recovery of certain development costs, up to 70% of "Membership Revenue", 35% of "Unit Revenue" (i.e., sales proceeds from condo units) and up to 70% of "Lot Revenue" (i.e., sales proceeds from residential lot sales).  The Sellers also were to receive 10% of fees paid to Randall Bone for "sweat equity" by the Buyer.  By its express terms, the Participation Agreement was intended to constitute an encumbrance upon the 60% interest in the Property.   A copy of the Participation Agreement is appended hereto as Exhibit "C".

23.    On March 14, 2006, as part of the closing under and pursuant to the PSA, a Memorandum of Participation Agreement was recorded as Instrument Number 2006-0181834 (the "Memo of Participation Agreement") in the Official Records of Riverside County.  The Memo of Participation Agreement incorporated the terms of the Participation Agreement by reference. Plaintiff is informed and believes that the Memo of Participation Agreement was intended to create record notice of the interest in the 60% interest in the Property created by the Participation

Gibson, Dunn &
Crutcher LLP

1    Agreement.  A copy of the recorded Memo of Participation Agreement is appended hereto as Exhibit

2    "D".

3              *The Hotel Agreement*

4              24.    The PSA and the Hotel Agreement appended to the PSA as Exhibit "E" thereto

5    allocated (i) 75% of the net proceeds from the sale of any hotel developed on the Property to the

6    Sellers and (ii) 50% of all net income generated by any hotel that might be built on the Property as

7    part of the purchase price.  Remarkably, despite the transfer of title to the 60% interest in the Property

8    to the Buyer, the Hotel Agreement conferred ongoing rights upon the Sellers to market any hotel with

9    the Buyer and, if that joint effort did not succeed, the Sellers were authorized to market the hotel for

10   sale unilaterally.  The Hotel Agreement also provided for the Sellers to share any operating losses at

11   the hotel by netting out losses against profits generated by hotel operations.  A copy of the Hotel

12   Agreement is appended hereto as Exhibit "E".

13             25.    On March 14, 2006, as part of the closing under and pursuant to the PSA, that certain

14   Memorandum of Agreement Concerning Hotel was recorded as Instrument Number 2006-0181835

15   (the "Memo of Hotel Agreement") in the Official Records of Riverside County.  The Memo of Hotel

16   Agreement incorporated the terms of the Hotel Agreement by reference.  Plaintiff is informed and

17   believes that the Memo of Hotel Agreement was intended by the Sellers to create record notice of the

18   interest in the 60% interest in the Property created by the Hotel Agreement.  A copy of the recorded

19   Memo of Hotel Agreement is appended hereto as Exhibit "F".

20             *The Third TD*

21             26.    Section 2 of the PSA and its exhibits also provided that upon a sale of the entire

22   Property to a third-party by the Buyer and the then-owner of the 40% interest in the Property, the

23   Sellers would receive 60% of all "Third Party Net Proceeds."  To secure payment of this additional

24   component of the purchase price, the Buyer executed the Third TD identified as that certain

25   Subordinate Long Form Deed of Trust and Assignment of Rents, dated as of March 15, 2006, as

26   "Trustor," in favor of the Sellers, as "Beneficiary," and recorded on March 15, 2006 as Instrument

27   Number 2006-0183117 in the Official Records of Riverside County.  After giving effect to certain

28   written subordination agreements (*described in greater detail in paragraphs 42 through 48 below*),

1   the Third TD  constituted a third-priority lien upon the 60% interest in the Property as of March 14,

2   2006 and at all times thereafter until extinguished in 2009 upon completion of a trustee's sale under

3   Plaintiff's senior lien.  The Third TD also secured payment of any amounts due under the Hotel

4   Agreement and/or the Participation Agreement.  A copy of the Third TD is appended hereto as

5   Exhibit "G".

6            *The Stradella Note*

7            27.     One-half of the $50 million non-contingent component of the purchase price for the

8   partnership interests in EIMS-Stradella was paid in cash at Closing.  The balance of the basic

9   purchase price, i.e., $25 million, was represented by the Stradella Note, the unique form of purchase-

10  money promissory note executed in the principal sum of $25 million in favor of the Sellers and

11  secured by a Deed of Trust intended to constitute a first-priority lien upon the 60% interest in the

12  Property.  The Stradella Note is extraordinarily unusual in many respects.  First, the Stradella Note

13  lacks a stated maturity date on which the principal balance becomes due and payable in full.  Rather,

14  the *entire* principal balance of the Stradella Note is only due by its terms upon the occurrence of

15  events relating to the Property solely and exclusively within the control of its owner.  Only an owner

16  of the 60% interest in the Property, --not the Debtor, not the Estate and not the Trustee-- can

17  undertake the acts needed to trigger the duty to pay the principal balance of the Stradella Note.  Given

18  the generally and deeply depressed market conditions now prevalent throughout the Coachella

19  Valley, it is readily conceivable that none of the events which could trigger payment will occur

20  within the next 15 years.

21           28.     The Stradella Note is unusual in other respects:  Interest did not start to accrue on the

22  unpaid principal balance of the Stradella Note until the "Interest Commencement Date," a term

23  defined in the Stradella Note, but calculated with reference to section 5.2 of the PSA.  As of March

24  14, 2006, when the sale contemplated by the PSA was consummated, the "Interest Commencement

25  Date" (as determined with reference to the content of section 5.2 as of such time), was in mid-May of

26  2011.  Equally unusual is the fact that the Stradella Note fails to define *any* of the key terms that

27  govern *when* payments are to be made under the Stradella Note.  Thus, all defined terms that control

28  when the principal balance becomes due (i.e., the "Total Property Acquisition Date" or the "60%

Acquisition Date") or when the obligation to pay interest commences ("Interest Commencement Date") under the Stradella Note are all determined solely by the content of language in the PSA. Without the PSA, it is impossible to determine when payments under the Stradella Note are to be made.  The PSA and the Stradella Note are inextricably intertwined.  A copy of the Stradella Note is appended hereto as Exhibit "H".

*The Stradella TD*

29.     To secure the obligation of the Buyer to pay the Stradella Note, the Buyer executed that certain Long Form Deed of Trust and Assignment Rents, dated as of March 14, 2006, executed by Buyer, as "Trustor" or "Borrower," to and in favor of the Sellers, as "Beneficiary" or "Lender," recorded on March 14, 2006 as Instrument Number 2006-0181833 in the Official Records of Riverside County, intended to constitute a first-priority lien upon the 60% interest in the Property.  A copy of the Stradella TD is appended hereto as Exhibit "I".  The Stradella Note is subject to the protections and benefits of California Code of Civil Procedure Section 580b which bars recovery of a deficiency judgment under a note given to a seller to pay any part of the purchase price of real property and secured by a deed of trust on such real property.  The protection afforded to the makers of purchase-money promissory notes under California Code of Civil Procedure Section 580b is such a fundamental principle of California law that the California Supreme Court held that Section 580b can *never* be waived.

30.     The Stradella TD itself is unique and further reflects the complex nature of the transaction negotiated by the Sellers.  The Stradella TD is sparse and short.  The Stradella TD does not contain many of the protections typically embodied in deeds of trust.  For example, unlike virtually every deed of trust executed in the past fifty years, there is no "due-on-sale" clause in the Stradella TD.  Thus, both RM Eagle and any other owner of the 60% interest in the Property, was free at any time to sell its interest in the Property to any third-party who would simply take "subject to" the lien of the Stradella TD (to the extent otherwise extant).  The absence of the ubiquitous "due-on-sale" clause in the Stradella TD also reflects the extraordinary range of rights granted to the Sellers to market the 60% interest in the Property despite the transfer of title to the Buyer.

Gibson, Dunn &
Crutcher LLP

12

31.    The precise terms of the Stradella TD were the result of extensive negotiations between the Sellers and the Buyer that resulted in a "stripped down" lien instrument that did little more than grant a contractual power of sale if the amounts owed under the Stradella Note were not paid.

*The Commercial Parcel*

32.    The PSA also provided that the Buyer would hold record title to a small part of the 60% interest in the Property consisting of roughly 26 acres referred to by the parties as the so-called "Commercial Parcel" (the "Commercial Parcel") in trust for the Debtor.  As of March 14, 2006, and at all times thereafter to and including the date of this Complaint, the Commercial Parcel was not, and is not, a valid legal parcel under the California Subdivision Map Act and thus cannot lawfully be conveyed under California law.  As structured by the parties, the Buyer only held "bare legal title" to the Commercial Parcel.  At the closing of the sale of the partnership interests to the Buyer, the Sellers and the Buyer executed that certain Agreement Concerning The Commercial Parcel, dated as of March 14, 2006 (the "CPA" or "Commercial Parcel Agreement"), which expressly provided that "[t]he Partnership is the owner of the Property as a result of the contribution of the Property to the Partnership by Sellers. *The contribution of the Property to the Partnership was made with the reservation that the 60% Undivided Interest does not include any interest in the Commercial Parcel and that the Property does not include any Appurtenance or Intangible Property attributable to the Commercial Parcel. . . .*"  The Commercial Parcel Agreement expressly states that the Commercial Parcel is held "*in trust for the benefit of Sellers.*"  (*emphasis added*).  The CPA obligated the Buyer to convey record title to the Sellers "promptly after the Commercial Parcel becomes a separate legal parcel."  In recognition of the fact that the entire Property was undeveloped and unentitled, the CPA specifically allowed the Buyer the unfettered right to dedicate or transfer *all* or any part of the Commercial Parcel "pursuant to the final order or administrative action of a court, government agency or other administrative body with jurisdiction over the Commercial Parcel", notwithstanding the retained interest of the Sellers in the Commercial Parcel.

33.    To provide record notice of the interest reserved in the Commercial Parcel by the sellers, a "Memorandum of Agreement Concerning Commercial Parcel" was recorded on March 14,

2006, as Instrument Number 2006-0181832 with the Riverside County Recorder.  A copy is attached as Exhibit "J."

## PART II:

## FINANCING THE TRANSACTION

34.    All that remained for the transaction contemplated by the PSA to close was for the Buyer to obtain at least $25 million in additional financing to provide the balance of cash needed to fund the cash portion of the "basic purchase price" in the sum of $25,000,000 required to be paid to the Sellers under the PSA at closing on March 14, 2006 and other related expenses.  The PSA and several of its exhibits expressly contemplated the Buyer obtaining additional financing to close the transaction.  To do so, the Buyer approached First National of America, Inc., a Florida corporation based in New Jersey ("FNA") which was engaged in the business of selling and packaging golf course and resort loans to investors.  FNA agreed to fund an acquisition and development loan in the maximum principal amount of $43 million to the Buyer (the "RM Eagle Loan") to be secured by a second-priority deed of trust subordinate *only* to the Stradella TD and the Commercial Parcel Agreement.  Since the RM Eagle Loan was the source of the $25 million to be paid by the Buyer to the Sellers at Closing in cash, the RM Eagle Loan and the sale of the partnership interests in EIMS-Stradella under the PSA needed to close at the same time.

35.    FNA, prior to the closing and funding of the RM Eagle Loan, had arranged for the RM Eagle Loan to be purchased right after  origination and funding by an investment fund affiliated with or managed by Stark Investments ("Stark Investments").  Concurrently with the closing of the RM Eagle Loan, FNA sold the RM Eagle Loan to a Stark Investments fund known as Fairway Onshore Loan Fund LLC, a Delaware limited liability company.  On March 28, 2006, an assignment of the deed of trust securing the RM Eagle Loan to Fairway Onshore Loan Fund LLC was recorded as Instrument Number 2006-0218399 in the Official Records of Riverside County.  On May 14, 2007 an assignment of the deed of trust securing the RM Eagle Loan to SR Structured Lot Options I LLC, also a Stark Investments fund, was recorded as Instrument No. as Instrument Number 2007-0319164 in the Official Records of Riverside County.    On December 5, 2007, an assignment of the deed of trust securing the RM Eagle Loan to Stark Onshore Master Holding LLC, also a Stark Investments

fund, was recorded as Instrument Number 2007-0730208 in the Official Records of Riverside County.  Although the RM Eagle Loan was subsequently assigned to another affiliate of Stark Investments by a transfer of the debt, since the funding of the RM Eagle Loan in March, 2006, the RM Eagle Loan has been held by an affiliate of or fund managed by Stark Investments at all times.

36.     Concurrently with the closing of the sale of the partnership interests in EIMS-Stradella to the Buyer, FNA funded the RM Eagle Loan.  The RM Eagle Loan is evidenced by that certain Promissory Note, dated March 14, 2006, executed in favor of FNA, in the principal amount of $43,000,000 (the "Stark Note"). A copy of the Stark Note is appended as Exhibit "K".  The entire principal balance of the Stark Note and all accrued interest thereon was due and payable to Stark in full on September 14, 2008.  No payments of interest or principal under the Stark Note were ever made by RM Eagle.

37.     Payment of the Stark Note was secured by that certain Deed of Trust, Assignment of Leases and Rents and Security Agreement, dated as of March 14, 2006, executed by Buyer, as "Trustor" or "Borrower", to and in favor of FNA, as "Beneficiary" or "Lender," and recorded on March 14, 2006 as Instrument Number 2006-0181836 (the "Stark TD") in the Official Records of Riverside County.  A copy of the Stark TD is appended hereto as Exhibit "L".

38.     The Stark TD was intended to be subordinate *only* to the Stradella TD and the Commercial Parcel Agreement but only to the extent precisely set forth in the Intercreditor Agreement executed by FNA and the Sellers at the concurrent closing of the sale of the partnership interests in EIMS-Stradella and the RM Eagle Loan.  To accomplish this, the Buyer, the Sellers and FNA utilized an escrow at First American Title (the "Escrow") established under the PSA to coordinate recording of multiple agreements appended as exhibits to the PSA, (including the Stradella TD, the Third TD, the Commercial Parcel Agreement, the Memorandum of Purchase Agreement, the Memorandum of Participation Agreement and the Memorandum of Hotel Agreement), recording of the Stark TD and the issuance of title insurance policies.

## PART III:

## CLOSING THE ESCROW

Gibson, Dunn &
Crutcher LLP

39.     To evidence the understandings between the Sellers and FNA with respect to the relative priority of the lien of the Stark TD to (i) the respective liens of each of the Stradella TD and the Third TD and (ii) each of the Commercial Parcel Agreement, the Memorandum of Purchase Agreement, the Memorandum of Participation Agreement and the Memorandum of Hotel Agreement, the parties executed two entirely separate subordination agreements and delivered those to Escrow for recording on March 14, 2006 and March 15, 2006 in the Official Records of Riverside County with each of the other exhibits to the PSA which were to be recorded as part of the closing under the PSA. The two subordination agreements between FNA and the Sellers are:

(i)  Subordination and Standstill Agreement, dated as of March 14, 2006, executed by and between the Sellers, as "Subordinate Lender", and FNA, as "Superior Lender," and recorded on March 15, 2006 as Instrument Number 2006-0183118 (the "Subordination Agreement") in the Official Records of Riverside County.  A copy of the Subordination Agreement is appended hereto as Exhibit "M";  and

(ii)  Intercreditor Agreement, dated as of March 14, 2006, executed by and between the Sellers, as "First Lender", and FNA, as "Second Lender" and recorded on March 14, 2006 as Instrument Number 2006-0181839 (the "Intercreditor Agreement") in the Official Records of Riverside County.  A copy of the Intercreditor Agreement is appended hereto as Exhibit "N".

40.     Although each of the Subordination Agreement and the Intercreditor Agreement were executed to establish relative priorities between competing liens and interests in real and personal property, the two documents are entirely separate and very different.  The Intercreditor Agreement governed the priorities between the Stark TD and the Stradella TD.  By contrast, the Subordination Agreement covered a much broader universe of documents and obligations and governed the priority between the Stark TD as a lien or interest in the 60% interest in the Property, on the one hand, and the PSA, the Third TD and *each and all* of the other documents or instruments executed or delivered in connection with the PSA, on the other (other than the Stradella TD, the Stradella Note and the Commercial Parcel Agreement).

Gibson, Dunn &
Crutcher LLP

41.     The two instruments differ strikingly in other equally fundamental ways.  Thus, the Intercreditor Agreement, while rendering the Stark TD subject and subordinate to the Stradella TD, did so on a conditional basis and expressly excluded from such subordination any extensions or modifications of the "Senior Debt" (i.e., the Stradella Note and the Stradella TD) not previously approved by Stark.  The Subordination Agreement is absolute in terms of subordination and made no exception for most extensions or modifications of the "Superior Document Liabilities."  In stark juxtaposition to each other, the Intercreditor Agreement contains a covenant by the Sellers (there, the "senior lender") not to amend its debt without the prior written consent of Stark in Stark's sole discretion, while the Subordination Agreement broadly authorizes Stark (there, the "senior lender") to enter into any "amendment, deferral, extension, modification, increase, renewal, replacement, consolidation, supplement or waiver" of its debt.  Lastly, the Subordination Agreement precluded payment of any part of the "junior debt" until the Stark Note is paid in full while the Intercreditor Agreement imposed only lien subordination, not payment subordination.

*The Subordination and Standstill Agreement*

42.     The Subordination Agreement provided, on absolute and unconditional terms, that the Stark TD would *always* rank senior and prior to the PSA, the Third TD and *every* other document or instrument executed or delivered in connection with the PSA as a lien or interest upon the 60% interest in the Property, with the sole exception of the Stradella TD, the Stradella Note and the Commercial Parcel Agreement.  As set forth in very specific, clear and unambiguous language quoted at length below, the Subordination Agreement *forever* rendered each of the PSA, the Third TD, the Participation Agreement, the Memorandum of Participation Agreement, the Memorandum of Purchase Agreement and the Memorandum of Hotel Agreement, as well as every other document or instrument (other than the Stradella TD, the Stradella Note and the Commercial Parcel Agreement) delivered in connection with the PSA absolutely subject and subordinate to the lien of the Stark TD and to payment in full of the Stark Note and all other obligations arising in connection with the RM Eagle Loan closed by FNA.

43.     In its broadest terms, the Subordination Agreement made both the lien of the Third TD and every obligation it secured, as well as payment and performance of all obligations under the PSA,

the Participation Agreement, the Hotel Agreement, the Memorandum of Participation Agreement, the Memorandum of Purchase Agreement and the Memorandum of Hotel Agreement, absolutely junior and subordinate to the lien of the Stark TD *and* to payment in full of the Stark Note and all other obligations arising in connection with the RM Eagle Loan closed by FNA.  The Subordination Agreement not only subordinated the priority of lien of the Third TD and made each and all of the PSA, the Third TD, the Participation Agreement, the Memorandum of Participation Agreement, the Hotel Agreement, the Memorandum of Purchase Agreement and the Memorandum of Hotel Agreement subject, subordinate and junior in priority to the *lien* of the Stark TD, but also subordinated in *right* of payment and in *time* of payment all of the Sellers' various rights under the PSA and its exhibits by which the Sellers would receive their anticipated share of the future profits and operating income derived from the 60% interest in the Property to indefeasible payment in full of the Stark Note.  In other words, until Stark got paid, the Sellers were "standing still".

44.    The Subordination Agreement makes reference to each of the three deeds of trust executed in connection with the Escrow:

(i) the "Stradella TD" in favor of the Sellers and which is identified and defined therein as the "*First Mortgage*";

(ii) the "Stark TD" which is identified and defined therein as the "*Superior Mortgage*"; and

(iii) the "Third TD " in favor of Sellers and which is identified and defined therein as the "*Subordinate Mortgage*".

45.    To facilitate subordination of the Sellers' rights to be paid, the Subordination Agreement also carefully defined the obligations secured by the Subordinate Mortgage (i.e., the Third TD) in the following three definitions:

"*Subordinate Documents*" means, collectively, the Subordinate Mortgage and the Purchase and Sale Documents, as any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time, subject to the limitations and agreements contained in this Agreement."

"*Subordinate Document Liabilities*" shall mean, collectively, all of the indebtedness, liabilities and obligations of Borrower evidenced by the Subordinate Documents and all amounts due or to become due pursuant to the Subordinate Documents, including interest thereon and any other amounts payable in respect thereof or in connection therewith, including any late charges, default interest, prepayment fees or premiums, exit fees, advances and post-petition interest (but excluding the First Cash Portion Payment and the Second Cash Portion Payment (which is evidenced by the First Note), as such terms are defined in the Purchase and Sale Agreement)."

"*Purchase and Sale Documents*'  means, *collectively*, *the Purchase and Sale Agreement and all* of the other *documents* or instruments executed or delivered in connection therewith, *including* without limitation, *the Participation Agreement (and the Memoranda executed in connection therewith), the Purchase Agreement Memorandum and the Hotel Agreement*, as those terms are defined in the Purchase and Sale Agreement, but excluding" … the Stradella TD, the Stradella Note and the Commercial Parcel Agreement.  (*Emphasis added.*)

46.      The language in the Subordination Agreement which operates to render each of the "Subordinate Document Liabilities" subject and subordinate to both the Superior Loan Liabilities and the Superior Loan Documents is found in section 6(a) of the Subordination Agreement which provides that:

"All of Subordinate Lender's rights to payment and performance of the Subordinate Document Liabilities, and any liens created pursuant to the Subordinate Documents, are and at all times shall be subject and subordinate to all of Superior Lender's rights to payment and performance of the Superior Loan Liabilities, and the liens created pursuant to the Superior Loan Documents, and to all of the terms, covenants and conditions of the Superior Loan Documents, and to any extensions, substitutions, modifications, amendments, renewals, refinancings, replacements and consolidations thereof, and Subordinate Lender shall not accept or receive payments

1   (including, without limitation, whether in cash or other property and whether received

2   directly, indirectly or by set-off, counterclaim or otherwise) from Borrower and/or

3   from the Premises of any Subordinate Document Liabilities prior to the date that all of

4   the Superior Loan Liabilities shall have been paid in full."

5       47.    In addition, in section 6(a), the Sellers expressly agreed not to "declare a default under

6   any of the Subordinate Documents, take any Enforcement Action or take any other action …related

7   thereto"  until ninety-one (91) days after payment in full of all amounts due on the Stark Note.

8       48.    Based upon the express language of the Subordination Agreement, the Subordination

9   Agreement rendered *each and every one of the following documents and instruments* absolutely and

10  forever subject and subordinate to (a) the lien of the Stark TD and (b) to payment in full of all of the

11  "Superior Loan Liabilities" and "any extensions, substitutions, modifications, amendments, renewals,

12  refinancings, replacements and consolidations thereof:"

13      The Purchase and Sale Agreement and all of the other documents or instruments

14      executed or delivered in connection therewith

15      The Participation Agreement

16      The Hotel Agreement

17      The Third TD

18      Memorandum of Participation Agreement recorded as Instrument Number 2006-

19      0181834

20      Memorandum of Agreement Concerning Hotel recorded as Instrument Number 2006-

21      0181835

22      Memorandum of Purchase and Sale Agreement recorded as Instrument Number 2006-

23      149387

24      Any and all liens, rights, duties, obligations, interests, claims and privileges arising

25      under any of the foregoing or evidenced thereby.

26  Thus, everything received by the Sellers upon the close of Escrow under the PSA (excluding only

27  the Stradella TD, the Stradella Note and the Commercial Parcel Agreement) was absolutely subject

28

Gibson, Dunn &
Crutcher LLP

20

1  and subordinate to the lien of the Stark TD and to payment in full of the Stark Note and all other

2  obligations arising in connection with the RM Eagle Loan closed by FNA.

3       *The Intercreditor Agreement*

4       49.     The Intercreditor Agreement executed by the Sellers and FNA in March, 2006

5  governed the priority among and between the Stark TD and the Stradella TD.  However, unlike the

6  Subordination Agreement, the Intercreditor Agreement does not absolutely and forever subordinate

7  the Stark TD to the Stradella TD but did so on a conditional basis that ceased to be effective if

8  Stradella failed to comply with the terms of the Intercreditor Agreement with respect to "amendment,

9  deferral, extension, modification, increase, renewal, replacement, consolidation, supplement or

10  waiver" of the Stradella Note, its payment terms or the Stradella TD.  Thus, section 6(a) of the

11  Intercreditor Agreement expressly provides that "such subordination shall *not* apply to any First Loan

12  Modification entered into in violation of <u>Section 5(a)</u> above".  (*emphasis added*.)

13       50.     The Intercreditor Agreement is a multi-faceted and quite comprehensive agreement

14  with 20 pages of substantive content executed between two experienced and sophisticated parties

15  represented by top-notch counsel that expressly acknowledged that "First Lender and Second Lender

16  are each sophisticated lenders and/or investors in real estate".  The Intercreditor Agreement was

17  intended, by its terms, to govern every aspect of the relationship between Stark and Stradella with

18  respect to the Stradella Note and the Stark Note.  Thus, the Intercreditor Agreement contains

19  extensive approvals by each of the Sellers and FNA of the two notes respectively held by the *other*

20  party and the precise form and content of each and every document which secured or related to the

21  Stradella Note or the Stark Note.

22       51.     The Intercreditor Agreement restricted what the Sellers could do with the Stradella

23  Note so long as the Intercreditor Agreement remained in effect.  After carefully establishing the

24  precise identify of every document or instrument securing, evidencing or relating respectively to each

25  of the Stradella Note and to the Stark Note, the parties specifically agreed that going forward, *without*

26  *the prior written consent of Stark*, the Sellers would *never* modify or amend nor even agree to any

27  deferral of or forbearance upon the so-called "First Loan" (i.e., the Stradella Note) and its then-

28  effective terms so long as the Intercreditor Agreement remained in effect.  The Intercreditor

Gibson, Dunn &
Crutcher LLP

Agreement also imposed several material restrictions and limitations upon the rights of the Sellers to transfer the Stradella Note.   Each of the restrictions imposed upon the Sellers' right to transfer the Stradella Note, the ability to change the terms of the "First Loan" or to defer performance under the Stradella Note were intended to protect FNA, and in turn Stark (as the Intercreditor Agreement expressly contemplated and authorized the concurrent assignment of the "Second Loan" to Stark) by preventing any change whatsoever to the "First Loan" without Stark's prior written approval.

*Defined Terms in the Intercreditor Agreement*

52.   The operative language of the Intercreditor Agreement uses a series of defined terms in the provisions which establish and thereafter govern the relative priority of the Stradella TD and the Stark TD.   These defined terms--First Mortgage, Second Mortgage, First Loan, First Loan Documents, and First Loan Modification--are respectively defined as follows:

*First Loan, First Note & First Mortgage*

53.      The terms "First Loan, "First Mortgage" and "First Note" are each defined in the Recitals to the Intercreditor Agreement which states, in relevant part, that the Sellers are " ….the owner and holder of a loan to RM Eagle LLC, a Delaware limited liability company ("Borrower") in the original principal amount of $25,000,000.00 (the "First Loan"), which First Loan is evidenced by that certain Secured Promissory Note (the "First Note") dated as of the date hereof (the "Closing Date") made by Borrower to First Lender, and secured by that certain Long Form Deed of Trust and Assignment of Rents made by Borrower for the benefit of First Lender (the "First Mortgage")." Thus, under the Intercreditor Agreement, the purchase-money Stradella Note in the principal sum of $25 million is called the "First Note", the Stradella TD is defined as the "First Mortgage" and the debt itself is referred to as the "First Loan".

*"First Loan Documents*" & *"Second Mortgage*"

54.      The term "First Loan Documents" is defined in the Intercreditor Agreement as "collectively, the First Note and the First Mortgage, as any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time, subject to the limitations and agreements contained in this Agreement."

55.    The term "Second Mortgage" is defined in the Intercreditor Agreement as "that certain Deed of Trust, Assignment of Lease and Rents and Security Agreement (and Fixture Filing) dated as of the date hereof made by the Borrower for the benefit of Second Lender." Thus, under the Intercreditor Agreement, the Stark TD executed by RM Eagle to secure repayment of the $43 million Stark Note is referred to as the "Second Loan".

56.    Section 5(a) the Intercreditor Agreement contains the following unconditional agreement by the Sellers *never* to modify or defer the First Loan Documents *without* the prior consent of the Second Lender:

> *First Lender shall not*, without the prior written consent of Second Lender, in its sole discretion, in each instance, *enter into any amendment, deferral, extension, modification, increase, renewal, replacement, consolidation, supplement or waiver* (collectively, a "First Loan Modification") of the First Loan or the First Loan Documents" (*emphasis added*.)

57.    The Seller's covenant not to alter the terms of the Stradella Note is total and absolute. The Sellers expressly agreed that, without the prior written consent of Stark, as the Second Lender, the Stradella Note could not be modified, amended or changed in any manner as long as the Intercreditor Agreement remained in effect. The Intercreditor Agreement imposed no limits on whether Stark would provide consent to any proposed First Loan Modification; thus, any decision by Stark to grant or withhold a requested consent was expressly reserved to Stark's "sole discretion". Also, not only were "increases" of the Stradella Note precluded without Stark's consent, as would be anticipated to prevent erosion of a junior secured creditor's position, but the Intercreditor Agreement by its express terms blocked any "deferral" and any "replacement" of the First Loan. Any "amendment" and any "modification" of the First Loan Documents as well as any "waiver" by the Sellers required Stark's prior written consent from and after March 14, 2006.

58.    The intent of the parties to the Intercreditor Agreement is clear and unmistakable: The precise terms of the Stradella Note and Stradella TD, as they existed as of the closing of the sale in March, 2006, were to remain fixed and without *any* change unless Stark elected in its discretion to provide its written consent thereto. In agreeing to make a $43 million loan secured by a lien junior in

priority to the Stradella TD, Stark, as the Junior Lender, insisted that the precise terms of the so-called "First Loan" as well as the content of each of the "First Loan Documents" could never be varied without its consent.  The Intercreditor Agreement reflects the reality that, as a junior lienholder, Stark might find itself as the owner of the real property subject to the Stradella TD following a default by RM Eagle under the Stark TD.  Similarly, as a junior lienor, if RM Eagle had defaulted under the First Loan Documents, Stark would need to cure such defaults to stop the foreclosure of the senior lien of the Stradella TD.  Thus, in every instance, it was of utmost importance and critical to the risk allocation reflected in the precise terms of the Intercreditor Agreement that there could never be any changes made without Stark's prior written consent.  In other words, there could and would never be any "amendment, deferral, extension, modification, increase, renewal, replacement, consolidation, supplement or waiver" of the First Loan or the First Loan Documents without the prior written consent of Stark in its sole discretion.

59.    To further underscore the fundamental importance of the covenant by the Sellers not to modify, defer or waive any of the First Loan Documents, the parties to the Intercreditor Agreement specifically agreed that the Stark TD would not be subject and subordinate to any First Loan Modification which was entered into in violation of the covenant on section 5(a).  As a result, from and after the execution, delivery and recording of the Intercreditor Agreement, in order for the Stradella TD to maintain its priority as a lien senior to the Stark TD, the Sellers were required to refrain from entering into any First Loan Modification without first obtaining the written consent of Stark.  Any "amendment, deferral, extension, modification, increase, renewal, replacement, consolidation, supplement or waiver" of the First Loan or the First Loan Documents" entered into without the prior written consent of Stark would constitute a "First Lien Modification" junior and subordinate to the Stark TD.

60.    The language in the Intercreditor Agreement which governs the priority between the Stradella TD and the Stark TD is found in section 6(a) of the Intercreditor Agreement which states that:

"Second Lender hereby acknowledges and agrees that the Second Mortgage, and the liens and security interests created thereby, shall be subordinate and junior to the First

Mortgage, and the liens and security interests created thereby, *provided that such*
*subordination shall not apply to any First Loan Modification entered into in violation*
*of* <u>*Section 5(a)*</u> *above.*  (*emphasis added.*)

The foregoing language subordinates the Stark TD to the Stradella TD but expressly provides that
"such subordination" shall be inapplicable to "any First Loan Modification entered into in violation
of Section 5(a) above".   By excluding any First Loan Modification entered into in violation of
Section 5(a) from the lien priority otherwise established for the Stradella TD under section 6(a), the
parties to the Intercreditor Agreement agreed that the Stark TD would rank senior in priority to any
 First Loan Modification entered into in violation of Section 5(a).  The parties also agreed in section
6(b) that nothing in the Intercreditor Agreement "shall serve to restrict in any way whatsoever"
Stark's rights or remedies, specifically including enforcement of the Stark TD.

61.    The Intercreditor Agreement became effective no later than March 14, 2006.  By its
express terms, the Intercreditor Agreement was a "continuing agreement" that would thereafter
remain in full force and effect until termination upon payment of the debts respectively secured by
the Stradella TD or the Stark TD or the foreclosure of either of these two deeds of trust on the 60%
interest in the Property then vested in RM Eagle, the Buyer.  Significantly, however, under section
14(m), the rights and remedies of the parties to the Intercreditor Agreement expressly survived any
termination of the Intercreditor Agreement by payment or foreclosure as follows:

"This Agreement is a continuing agreement and shall remain in full force and effect until
the first to occur of (i) payment in full of all amounts payable to First Lender under the
First Loan Documents and discharge of the First Mortgage as a lien against the Premises,
or (ii) payment in full of all amounts payable to Second Lender under the Second Loan
Documents and discharge of the Second Mortgage as a lien against the Premises, or (iii)
the transfer of the Premises by foreclosure of the Second Loan Documents or other
Enforcement Action, or (iv) the transfer of the Premises by foreclosure as permitted
hereby of the First Loan Documents or other Enforcement Action as permitted hereby;
*provided, however, that (x) any rights or remedies of any party hereto arising out of any*

*breach of any provision hereof occurring prior to the date of termination shall survive*

*such termination ….  (Emphasis added).*

62.    The Intercreditor Agreement also contained reciprocal agreements between the parties to pay legal fees incurred in connection with a breach of the Intercreditor Agreement and to the prevailing party in the event of a dispute.  Thus, section 15(b) of the Intercreditor Agreement states:

"To the extent not paid by Borrower out of or from any collateral securing the applicable Second Loan which is realized by Second Lender, First Lender agrees upon demand to pay to Second Lender the amount of any and all reasonable expenses, including the reasonable fees and expenses of its counsel and of any experts or agents, which Second Lender may incur in connection with the (i) exercise or enforcement of any of the rights of Second Lender against First Lender hereunder to the extent that Second Lender is the prevailing party in any dispute with respect thereto or (ii) failure by First Lender to perform or observe any of the provisions hereof."

63.    When the Escrow closed and the Buyer and Sellers executed and delivered that certain unrecorded Assignment of Partnership Interests and Amendment to Agreement of Limited Partnership of EIMS-Stradella, dated for identification purposes as of March 14, 2006, to convey all of the partnership interests in EIMS-Stradella to the Buyer, the following documents were recorded in the Official Records of Riverside County with respect to the 60% interest in the Property on the following dates in precisely the following order:

**March 1, 2006**

Memorandum of Purchase and Sale Agreement, as Instrument Number 2006-149387

**March 14, 2006**

Substitution of Trustee & Deed of Full Reconveyance, as Instrument Number 2006-0181830

Grant Deed from EIMS-Stradella to RM Eagle, as Instrument Number 2006-0181131

Memorandum of Commercial Parcel Agreement, as Instrument Number 2006-0181832

Stradella TD, as Instrument Number 2006-0181833

1   Memorandum of Participation Agreement, as Instrument Number 2006-0181834

2   Memorandum of Agreement Concerning Hotel, as Instrument Number 2006-0181835

3   Stark TD, as Instrument Number 2006-0181836

4   Intercreditor Agreement, as Instrument Number 2006-0181839

5   **March 15, 2006**

6   Third TD, as Instrument Number 2006-0183117

7   Subordination and Standstill Agreement, as Instrument Number 2006-0183118

8                                    **PART IV:**

9              **DEFAULT & THE TRUSTEE'S SALE UNDER THE STARK TD**

10          64.      After the Escrow closed in mid-March, 2006, matters with respect to the 60% interest

11   in the Property appeared to proceed uneventfully.  In 2007 each of the subsidiaries of Stradella which

12   had been the former limited partners in EIMS-Stradella and were the Sellers who held the Stradella

13   Note from and after March 14, 2006, merged with and into Stradella.  In each instance of these six

14   mergers, Stradella was the surviving entity and the other party was the "disappearing" entity.  Upon

15   and after giving effect to each merger, Stradella thereby succeeded by operation of law to all assets

16   and liabilities of the disappearing entities, including, without limitation, their respective interests in

17   the Stradella Note and Stradella TD previously vested in the former limited partners of EIMS-

18   Stradella who had sold and conveyed their respective interests therein to RM Eagle.  On or about July

19   12, 2007, the interest in the Stradella TD formerly vested in the disappearing entities was assigned of

20   record to Stradella by an assignment of the beneficial interest in Stradella TD recorded in the Official

21   Records of Riverside County as Instrument Number 2007-0453304.  From and after July 12, 2007,

22   Stradella was, at all relevant times, the holder of all right, title, interest, claim and estate previously

23   vested in the six former limited partners of EIMS-Stradella who merged with and into Stradella.

24          65.      No payments were required on the Stark Note until the "Maturity Date" on September

25   14, 2008, at which time the entire principal balance and all accrued interest was due in full.  RM

26   Eagle, the obligor on the Stark Note, failed to pay any of the unpaid indebtedness when due.

27          66.      Stark engaged in unsuccessful negotiations with RM Eagle to restructure the RM

28   Eagle Loan in the latter part of calendar 2008, a process that, at some point, also included discussions

Gibson, Dunn &
Crutcher LLP

with Stradella.  After these efforts ultimately proved fruitless, Stark commenced the trustee's sale process and caused the recording of a Notice of Default under the Stark TD with respect to the 60% interest in the Property encumbered in the Fall of 2008.  Thereafter, the duly appointed Trustee under the Stark TD recorded that certain Notice of Trustee's Sale on February 4, 2009 as Instrument Number 2009-0053140 in the Official Records of Riverside County in accordance with applicable California law and scheduled a trustee's sale of the 60% interest in the Property on March 4, 2009.

67.    On March 4, 2009, the Trustee under the Stark TD conducted a trustee's sale of the 60% interest in the Property and all other property encumbered by the Stark TD.  Stark was the high bidder at the trustee's sale and acquired the 60% interest in the Property and all other property encumbered by the Stark TD by acquiring EIMS-Stradella with a partial credit bid equal to roughly 45% of the unpaid balance of the Stark Note.  The Trustee under the Stark TD executed and recorded that certain Trustee's Deed Upon Sale and Bill of Sale, dated March 4, 2009, as Instrument Number 2009-0115144 in the Official Records of Riverside County on March 11, 2009 (the "Trustee's Sale Deed").  A copy of the Trustee's Sale Deed is appended hereto as Exhibit "O". Among other things, the Trustee's Sale Deed recites that all requirements of law regarding the mailing, delivery and posting and publication of the Notice of Default and the Notice of Sale have been complied with in strict accordance with applicable California law.

68.    Plaintiff Stark RM Eagle LLC, has at all times since March 11, 2009 been the record and beneficial owner of the 60% interest in the Property and each and all of all other real and personal property conveyed by the Trustee's Sale Deed, free and clear of the lien of the Third TD and each and every other interest, right, encumbrance, lien or claim subordinate to the lien of the Stark TD, but subject to the rights existing in favor of the Debtor under the Commercial Parcel Agreement.

**PART V:**

**AMENDMENT OF THE OBLIGATIONS SECURED BY THE STRADELLA TD**

69.    Almost immediately after the close of the Escrow and the execution of the Intercreditor Agreement, Stradella entered into a First Loan Modification which altered the fundamental payment terms of the Stradella Note without the written consent of Plaintiff.  Stradella did so on no fewer than three entirely separate occasions.  At no time did Stradella seek written

1 consent by Stark to any of these "deferrals" nor did Stark ever deliver such requisite written consent

2 to any of these three separate deferrals.

3       70.    Plaintiff is informed and believes that the first of these three alterations and deferrals

4 of the fundamental payment terms of the Stradella Note happened in mid-May of 2006, barely 6

5 weeks after the Escrow had closed.  Attached hereto as Exhibit "P" is an unexecuted copy of that

6 certain Second Amendment To Agreement For The Purchase And Sale Of Partnership Interests And

7 Joint Escrow Instructions, dated "for identification purposes only as of May 15, 2006" (the "Second

8 Amendment") by and between the Sellers and the Buyer.  Plaintiff is informed and believes that the

9 Buyer and the Sellers each executed and delivered the Second Amendment on or about the middle of

10 May in 2006 substantially in the form appended hereto and that the Second Amendment thereupon

11 became effective between the parties thereto.   At no time did Stradella seek written consent by Stark

12 to the Second Amendment nor did Stark ever deliver such requisite written consent to the Second

13 Amendment or the First Loan Modification effected thereby.

14       71.    The Second Amendment amended Section 5.2 of the PSA to change the date by which

15 the Buyer was obligated to commence a civil action in Riverside County Superior Court to partition

16 the Property (the "Partition Action") between the two tenants-in-common who then held title to 40%

17 and 60% undivided interests in the Property, respectively.  By amending Section 5.2 of the PSA, the

18 Sellers modified and amended the Stradella Note and entered into a "deferral" of the First Loan, each

19 of which constitutes a "First Loan Modification" within the meaning of the Intercreditor Agreement.

20       72.    Prior to the Second Amendment, interest was not scheduled to accrue on the $25

21 million principal balance of the Stradella Note until the "Interest Commencement Date" which is

22 defined in the Stradella Note as the "fifth anniversary" of the deadline imposed by the PSA upon the

23 Buyer to file the Partition Action.   Thus, paragraph 1(a) of the Stradella Note states that:

24     "Interest shall commence on the fifth (5th) anniversary of the date (the "Interest

25     Commencement Date") upon which Maker is obligated to file a "Partition Action" as

26     provided for, and defined in Section 5.2 of that certain Agreement for the Purchase and

27     Sale of Partnership Interests and Joint Escrow Instructions, dated as of February 21,

28     2006, by and between Maker as "Buyer" and Holder as "Sellers" (the "Purchase

Agreement"). Capitalized terms used, but not otherwise defined, herein shall have the same meaning as in the Purchase Agreement.  Until the Interest Commencement Date, no interest shall accrue on this Note and no payments of interest shall otherwise be due."

After giving effect to the terms of the Stradella Note, as of the close of the Escrow and the delivery of the Intercreditor Agreement, the Interest Commencement Date could have been as early as May 15, 2011, the fifth anniversary of the then-operative deadline to file the Partition Action.  By executing the Second Amendment and thereby amending section 5.2 of the PSA to defer the deadline, the Sellers amended and modified the Interest Commencement Date to move it later in time and thereby entered into a "deferral" of the Stradella Note.

73.    Plaintiff is informed and believes that the second of the three deferrals of the fundamental payment terms of the Stradella Note was signed in mid-June of 2006, only a few weeks after the Second Amendment had already moved the Interest Commencement Date.  Attached hereto as Exhibit "Q" is an unexecuted copy of that certain Third Amendment To Agreement For The Purchase And Sale Of Partnership Interests And Joint Escrow Instructions, dated "for identification purposes only as of June 12, 2006" (the "Third Amendment ") by and between the Sellers and the Buyer.  Plaintiff is informed and believes that the Buyer and the Sellers each executed and delivered the Third Amendment in the middle of June, 2006 substantially in the form appended hereto and that the Third Amendment thereupon became effective between the parties thereto.   At no time did Stradella seek written consent by Stark to the Third Amendment nor did Stark ever deliver such requisite written consent to the Third Amendment or the First Loan Modification effected thereby.

74.    The Third Amendment further amended Section 5.2 of the PSA by again moving the date by which the Buyer was obligated to commence the Partition Action.  By amending Section 5.2 of the PSA, the Sellers modified and amended the Stradella Note and entered into a "deferral" of the First Loan, each of which constitutes a "First Loan Modification" within the meaning of the Intercreditor Agreement.

75.    Prior to the Third Amendment, the Interest Commencement Date could have been as early as June 1, 2011 (the fifth anniversary of the then-operative deadline to file the Partition Action).

Gibson, Dunn &
Crutcher LLP

By executing the Third Amendment, the Sellers modified the Interest Commencement Date to move it later in time and thereby entered into still another "deferral" of the Stradella Note.

76.     Plaintiff is informed and believes that the third and last of the three deferrals of the fundamental payment terms of the Stradella Note was signed in the Spring of 2008.  Attached hereto as Exhibit "R" is an executed copy of that certain Fourth Amendment To Agreement For The Purchase And Sale Of Partnership Interests And Joint Escrow Instructions, dated "for identification purposes only as of March 19, 2008" (the "Fourth Amendment") executed by and between Stradella and the Buyer.  Plaintiff is informed and believes that that the Fourth Amendment became effective upon and as of execution by each of the parties thereto.  At no time did Stradella seek written consent by Stark to the Fourth Amendment nor did Stark ever deliver such requisite written consent to the Fourth Amendment or the First Loan Modification effected thereby.

77.     The Fourth Amendment again amended the date by which the Buyer was obligated to commence the Partition Action.  The Fourth Amendment moved the Interest Commencement Date by nearly two years.  By executing the Fourth Amendment, the Sellers materially modified and amended the Stradella Note and entered into a "deferral" of the First Loan, each of which constitutes a "First Loan Modification" within the meaning of the Intercreditor Agreement.

78.     Prior to execution of the Fourth Amendment, the Interest Commencement Date would have been roughly July 5, 2011 (the fifth anniversary of the then-operative deadline to file the Partition Action).  By executing the Fourth Amendment to defer the deadline by almost two years to September 30, 2013, Stradella materially modified the Interest Commencement Date to move it substantially later in time and thereby entered into a "deferral" of the Stradella Note.

79.     In February, 2013, Stradella made reference to the Fourth Amendment in a pleading filed in this Court to explain how the Interest Commencement Date under the Stradella Note had been changed.  Subsequently, the Chapter 11 Trustee issued the Status Report which asserted (i) that an obligation to pay interest accrued under the Stradella Note on January 1, 2014 and (ii) the existence of a lien under the Stradella TD to secure such payment.  However, any such payment date arises from the last of the three "First Loan Modifications" entered into by Stradella in breach of the Intercreditor Agreement.  When Stradella entered into a First Loan Modification without the written

1    consent of Stark, the lien of the Stradella TD became subject and subordinate to the Stark TD by the

2    express terms of the Intercreditor Agreement.  Plaintiff's subsequent exercise of the power of sale

3    under the by-then senior Stark TD held by Plaintiff thus extinguished both the lien of the Stradella

4    TD and any right of the Estate to enforce the payment of interest or any other obligation secured by

5    such inferior lien by operation of law upon the 60% interest in the Property now vested in Plaintiff.

6    Thus, contrary to the Status Report, Plaintiff is the record and beneficial owner of a 60% tenant in

7    common interest in the Property free and clear of the Stradella TD.

8

9    ## FIRST CAUSE OF ACTION

10    ## SPECIFIC PERFORMANCE OF THE INTERCREDITOR AGREEMENT:

11    ## SUBORDINATION OF ENTIRE STRADELLA DEED OF TRUST

12        80.    Plaintiff hereby repeats and realleges each and all of the allegations contained in

13    paragraphs 1 through 79, inclusive, and incorporates them herein by reference with the same force

14    and effect as if set forth in full herein.

15        81.    Stark is entitled to a final judgment and decree against the Chapter 11 Trustee and all

16    right, title, interest, claim and estate held by the Chapter 11 Trustee in the Estate or otherwise vested

17    in the Chapter 11 Trustee under the United States Bankruptcy Code and applicable non-bankruptcy

18    law, finding and declaring each and all of the following:

19        (a)    During the period commencing upon May 15, 2006 and ending on March 19,

20    2008, in violation of section 5(a) of the Intercreditor Agreement, Stradella entered into one or

21    more deferrals of the so-called "First Loan" and thereby repeatedly altered the fundamental

22    payment terms of the Stradella Note without obtaining the required written consent of Stark;

23        (b)    Each of the three deferrals of the indebtedness evidenced by the Stradella Note

24    without the written consent by Stark constitutes (i) a First Loan Modification within the

25    meaning of the Intercreditor Agreement and (ii) a material breach of the Intercreditor

26    Agreement by Stradella;

27        (c)    As early as May 15, 2006, but in no event later than March 19, 2008, as of and

28    upon the respective execution and delivery of each of the Second Amendment, the Third

Gibson, Dunn &
Crutcher LLP

Amendment and the Fourth Amendment, the lien of the Stradella TD thereupon ceased to be a lien upon the 60% interest in the Property senior in priority to the lien of the Stark TD as expressly provided and agreed by the parties to the Intercreditor Agreement with respect to any First Loan Modification entered into in violation of section 5(a) of the Intercreditor Agreement;

(d)     As early as May 15, 2006, but in no event later than March 19, 2008, as of and upon the respective execution and delivery of each of the Second Amendment, the Third Amendment and the Fourth Amendment, the lien of the Stark TD thereupon became a lien upon the 60% interest in the Property senior in priority to the lien of the Stradella TD which thereupon and thereby became subject and subordinate to the lien of the Stark TD in its entirety as expressly provided and agreed by the parties to the Intercreditor Agreement with respect to any First Loan Modification entered into in violation of section 5(a) of the Intercreditor Agreement;

(e)     On and as of March 4, 2009, the lien of the Stradella TD was and remained subject and subordinate to the lien of the Stark TD in its entirety as expressly provided and agreed by the parties to the Intercreditor Agreement with respect to any First Loan Modification entered into in violation of section 5(a) of the Intercreditor Agreement; and

(f)     On March 4, 2009, the Trustee under the Stark TD conducted a trustee's sale of the 60% interest in the Property and all other property encumbered by the Stark TD.  Stark acquired the 60% interest in the Property and all other property encumbered by the Stark TD free and clear of the lien of the Stradella TD with a partial credit bid of $20 million and thereby extinguished the lien of the Stradella TD upon the 60% interest in the Property by operation of law, together with all claims, rights, interests, encumbrances, liens and other matters affecting title to the 60% interest in the Property subordinate in priority to the lien of the Stark TD.  Upon recordation of that certain Trustee's Deed Upon Sale and Bill of Sale, dated March 4, 2009, as Instrument Number 2009-0115144 in the Official Records of Riverside County on March 11, 2009, Stark acquired record and beneficial ownership of the

Gibson, Dunn &
Crutcher LLP

60% interest in the Property and all other property encumbered by the Stark TD free and clear of the lien of the Stradella TD.

**SECOND CAUSE OF ACTION**

**SPECIFIC PERFORMANCE OF THE INTERCREDITOR AGREEMENT:**

**SUBORDINATION OF LIEN SECURING PAYMENT OF INTEREST**

82.    Plaintiff hereby repeats and realleges each and all of the allegations contained in paragraphs 1 through 79, inclusive, and incorporates them herein by reference with the same force and effect as if set forth in full herein.

83.    Stark is entitled to a final judgment and decree against the Chapter 11 Trustee and all right, title, interest, claim and estate held by the Chapter 11 Trustee in the Estate or otherwise vested in the Chapter 11 Trustee under the United States Bankruptcy Code and applicable non-bankruptcy law, finding and declaring each and all of the following:

(a)    During the period commencing upon May 15, 2006 and ending on March 19, 2008, Stradella materially changed, amended, modified, deferred, postponed and otherwise altered the terms governing the accrual and payment of interest upon the indebtedness evidenced by the Stradella Note without obtaining the written consent of Stark in violation of section 5(a) of the Intercreditor Agreement;

(b)    Each and all of such changes, amendments, modifications, deferrals, postponements and alterations of the terms governing the accrual and payment of interest upon the so-called "First Loan" without the written consent by Stark constitutes (i) a "First Loan Modification" within the meaning of the Intercreditor Agreement to the extent of any obligation to pay interest upon the unpaid principal balance of the Stradella Note and (ii) a material breach of the Intercreditor Agreement by Stradella;

(c)    As early as May 15, 2006, but in no event later than March 19, 2008, as of and upon the respective execution and delivery of each of the Second Amendment, the Third Amendment and the Fourth Amendment, the lien of the Stradella TD thereupon ceased to be a lien on the 60% interest in the Property senior in priority to the lien of the Stark TD to the extent the Stradella TD theretofore had secured the obligation to pay interest upon the unpaid

principal balance of the Stradella Note, all as expressly provided and agreed by the parties to the Intercreditor Agreement with respect to any First Loan Modification entered into in violation of section 5(a) of the Intercreditor Agreement;

(d)    As early as May 15, 2006, but in no event later than March 19, 2008, as of and upon the respective execution and delivery of each of the Second Amendment, the Third Amendment and the Fourth Amendment, the lien of the Stark TD thereupon became a lien on the 60% interest in the Property senior in priority to the lien of the Stradella TD to the extent the Stradella TD theretofore had secured the obligation to pay interest upon the unpaid principal balance of the Stradella Note, and the lien of the Stradella TD thereupon became subject and subordinate to the lien of the Stark TD to the extent the Stradella TD theretofore had secured the obligation to pay interest upon the unpaid principal balance of the Stradella Note, as expressly provided and agreed by the parties to the Intercreditor Agreement with respect to any First Loan Modification entered into in violation of section 5(a) of the Intercreditor Agreement;

(e)    On and as of March 4, 2009, the lien of the Stradella TD was and remained subject and subordinate to the lien of the Stark TD to the extent the Stradella TD theretofore had secured the obligation to pay interest upon the unpaid principal balance of the Stradella Note, all as expressly provided and agreed by the parties to the Intercreditor Agreement with respect to any "First Loan Modification" entered into in violation of section 5(a) of the Intercreditor Agreement; and

(f)    On March 4, 2009, the Trustee under the Stark TD conducted a trustee's sale of the 60% interest in the Property and all other property encumbered by the Stark TD.  Stark acquired the 60% interest in the Property and all other property encumbered by the Stark TD free and clear of the lien of the Stradella TD with a partial credit bid of $20 million and, to the extent the Stradella TD theretofore had secured the obligation to pay interest upon the unpaid principal balance of the Stradella Note, extinguished the lien of the Stradella TD upon the 60% interest in the Property by operation of law, together with all claims, rights, interests, encumbrances, liens and other matters affecting title to the 60% interest in the Property

1    subordinate in priority to the lien of the Stark TD.   Upon recordation of that certain Trustee's

2    Deed Upon Sale and Bill of Sale, dated March 4, 2009, as Instrument Number 2009-0115144

3    in the Official Records of Riverside County on March 11, 2009, Stark acquired record and

4    beneficial ownership of the 60% interest in the Property and all other property encumbered by

5    the Stark TD free and clear of the lien of the Stradella TD to the extent the Stradella TD

6    theretofore had secured the obligation to pay interest upon the unpaid principal balance of the

7    Stradella Note.

8

9                                  **THIRD CAUSE OF ACTION**

10            **QUIET TITLE:  NO INTEREST OF THE ESTATE IN FUTURE PROFITS**

11            84.    Plaintiff hereby repeats and realleges each and all of the allegations contained in

12   paragraphs 1 through 79, inclusive, and incorporates them herein by reference with the same force

13   and effect as if set forth in full herein.

14            85.    An actual controversy now exists between Plaintiff and the Chapter 11 Trustee as to

15   the existence of an ongoing right of the Debtor or the Estate to a share of future income and profits

16   generated by the 60% interest in the Property now vested in Plaintiff.  This controversy directly and

17   adversely affects the 60% interest in the Property and clouds title to the 60% interest in the Property

18   now vested in Plaintiff.  Stark is entitled to a final judgment against the Chapter 11 Trustee and all

19   right, title, interest, claim and estate held by the Chapter 11 Trustee in the Estate or otherwise vested

20   in the Chapter 11 Trustee under the United States Bankruptcy Code and applicable non-bankruptcy

21   law, in favor of Stark, quieting title in and to the 60% interest in the Property in Stark finding and

22   declaring each and all of the following:

23            (a)    Stark has been in exclusive possession of the 60% interest in the Property since

24            at least on or about March 4, 2009.  During that time period, Plaintiff has paid all property

25            taxes assessed against its interest in the Property and maintained the Property.  An actual

26            controversy now exists as the Chapter 11 Trustee has asserted in the Status Report the

27            possible existence of an ongoing right of the Debtor and/or the Estate to a share of future

28            income and profits generated by the Property.

Gibson, Dunn &
Crutcher LLP

36

(b)      The claim asserted by the Trustee is entirely lacking in merit.  The Subordination and Standstill Agreement absolutely and forever subordinated the lien of the Third TD and each and all of the PSA, all of the other documents or instruments executed or delivered in connection with the PSA, therewith, including without limitation, the Participation Agreement (and the Memorandum of Participation Agreement), the Purchase Agreement Memorandum and the Hotel Agreement to the lien of the Stark TD;

(c)      At all times from and after March 14, 2006, the Subordination Agreement rendered the Stark TD absolutely and forever unconditionally senior and superior to *each and every* one of:

> The Purchase and Sale Agreement
>
> The Participation Agreement
>
> The Hotel Agreement
>
> The Third TD
>
> Memorandum of Participation Agreement recorded as Instrument Number 2006-0181834
>
> Memorandum of Agreement Concerning Hotel recorded as Instrument Number 2006-0181835
>
> Memorandum of Purchase and Sale Agreement recorded as Instrument Number 2006-149387
>
> Any and all liens, rights, duties, obligations, interests, claims and privileges arising under any of the foregoing or evidenced thereby;

(d)      as of March 4, 2009, each and all of the "Purchase and Sale Agreement and all of the other documents or instruments executed or delivered in connection therewith", the Participation Agreement, the Hotel Agreement, the Third TD, that certain Memorandum of Participation Agreement recorded as Instrument Number 2006-0181834, that certain Memorandum of Agreement Concerning Hotel, as Instrument Number 2006-0181835, and that certain Memorandum of Purchase and Sale Agreement recorded as Instrument Number 2006-149387, together with all liens rights, duties, obligations, interests, claims and privileges

arising under any of the foregoing or evidenced thereby, were absolutely junior and
subordinate to the lien of the Stark TD and to payment in full of the Stark Note;

        (e)      On March 4, 2009, the Trustee under the Stark TD conducted a trustee's sale
of the 60% interest in the Property and all other property encumbered by the Stark TD.  Stark
thereupon and thereby acquired the 60% interest in the Property and all other property
encumbered by the Stark TD with a partial credit bid and thereby fully and forever
extinguished, by operation of law, the lien of the Third TD and each and all of the "Purchase
and Sale Agreement and all of the other documents or instruments executed or delivered in
connection therewith", the Participation Agreement, the Hotel Agreement, that certain
Memorandum of Participation Agreement recorded as Instrument Number 2006-0181834,
that certain Memorandum of Agreement Concerning Hotel, as Instrument Number 2006-
0181835, and that certain Memorandum of Purchase and Sale Agreement recorded as
Instrument Number 2006-149387, together with all liens, rights, duties, obligations, interests,
claims and privileges arising under any of the foregoing or evidenced thereby and any and all
other matters affecting title to the 60% interest in the Property then subordinate in priority to
the lien of the Stark TD;

        (f)      Upon recordation of that certain Trustee's Deed Upon Sale and Bill of Sale,
dated March 4, 2009, as Instrument Number 2009-0115144 in the Official Records of
Riverside County on March 11, 2009, as a matter of law and by operation of law, Stark
acquired record and beneficial ownership of the 60% interest in the Property and all other
property encumbered by the Stark TD free and clear of each and all of the Third TD, the
"Purchase and Sale Agreement and all of the other documents or instruments executed or
delivered in connection therewith", the Participation Agreement, the Hotel Agreement, that
certain Memorandum of Participation Agreement recorded as Instrument Number 2006-
0181834, that certain Memorandum of Agreement Concerning Hotel, as Instrument Number
2006-0181835, and that certain Memorandum of Purchase and Sale Agreement recorded as
Instrument Number 2006-149387, together with all liens arising therein, all rights, duties,
obligations, interests, claims and privileges arising under or evidenced by any of the

1    foregoing, as well as each and every other claim, right, interest, encumbrance, lien or matter

2    affecting title to the 60% interest in the Property then subordinate in priority to the lien of the

3    Stark TD, subject only to the Commercial Parcel Agreement; and

4         (g)    Neither Stark nor the 60% interest in the Property now vested in Stark is

5    subject to, bound, burdened, encumbered or in any manner or to any to extent, nor affected by

6    any of:

7              The Purchase and Sale Agreement

8              The Participation Agreement

9              The Hotel Agreement

10             The Third TD

11             Memorandum of Participation Agreement recorded as Instrument Number

12             2006-0181834

13             Memorandum of Agreement Concerning Hotel recorded as Instrument Number

14             2006-0181835

15             Memorandum of Purchase and Sale Agreement recorded as Instrument

16             Number 2006-149387

17             Any and all liens, rights, duties, obligations, interests, claims and privileges

18             arising under any of the foregoing or evidenced thereby.

19

20         **FOURTH CAUSE OF ACTION**

21    **QUIET TITLE:  STARK TOOK "FREE & CLEAR" OF THE STRADELLA TD**

22    86.    Plaintiff hereby repeats and realleges each and all of the allegations contained in

23    paragraphs 1 through 79, inclusive, and incorporates them herein by reference with the same force

24    and effect as if set forth in full herein.

25    87.    An actual controversy now exists between Plaintiff and the Chapter 11 Trustee as to

26    the purported existence of the Stradella TD and any rights of the Estate or the Debtor under the

27    Stradella TD to enforce payment of any obligation formerly secured thereby.  This controversy

28    directly and adversely affects the 60% interest in the Property and clouds title to the 60% interest in

the Property now vested in Plaintiff.  Stark is entitled to a final judgment quieting title in and to the

60% interest in the Property in Stark against the Chapter 11 Trustee and all right, title, interest, claim

and estate held by the Chapter 11 Trustee in the Estate or otherwise vested in the Chapter 11 Trustee

under the United States Bankruptcy Code and applicable non-bankruptcy law, in favor of Stark

finding and declaring each and all of the following:

        (a)      Stark has been in exclusive possession of the 60% interest in the Property since

at least on or about March 4, 2009.  During that time period, Plaintiff has paid all property

taxes assessed against its interest in the Property and maintained the Property.  An actual

controversy now exists as the Chapter 11 Trustee has asserted in the Status Report that

Plaintiff "is the current owner of the 60% tenant in common interest in the Property, *subject to

the Note secured by the First DOT*."  (*Emphasis added.*).  Plaintiff Stark maintains that the

lien of the Stradella TD was extinguished on March 4, 2009;

        (b)      During the period commencing upon May 15, 2006 and ending on March 19,

2008, in violation of section 5(a) of the Intercreditor Agreement, Stradella entered into one or

more deferrals of the so-called "First Loan" and thereby repeatedly altered the fundamental

payment terms of the Stradella Note without obtaining the required written consent of Stark.

Each of the three deferrals of the indebtedness evidenced by the Stradella Note without the

written consent by Stark constitutes (i) a First Loan Modification within the meaning of the

Intercreditor Agreement and (ii) a material breach of the Intercreditor Agreement by

Stradella;

        (c)      As early as May 15, 2006, but in no event later than March 19, 2008, as of and

upon the respective execution and delivery of each of the Second Amendment, the Third

Amendment and the Fourth Amendment, the lien of the Stradella TD thereupon ceased to be a

lien upon the 60% interest in the Property senior in priority to the lien of the Stark TD as

expressly provided and agreed by the parties to the Intercreditor Agreement with respect to

any First Loan Modification entered into in violation of section 5(a) of the Intercreditor

Agreement;

Gibson, Dunn &
Crutcher LLP

(d)      As early as May 15, 2006, but in no event later than March 19, 2008, as of and upon the respective execution and delivery of each of the Second Amendment, the Third Amendment and the Fourth Amendment, the lien of the Stark TD thereupon became a lien upon the 60% interest in the Property senior in priority to the lien of the Stradella TD which thereupon and thereby became subject and subordinate to the lien of the Stark TD in its entirety as expressly provided and agreed by the parties to the Intercreditor Agreement with respect to any First Loan Modification entered into in violation of section 5(a) of the Intercreditor Agreement;

(e)      On and as of March 4, 2009, the lien of the Stradella TD was and remained subject and subordinate to the lien of the Stark TD in its entirety as expressly provided and agreed by the parties to the Intercreditor Agreement with respect to any First Loan Modification entered into in violation of section 5(a) of the Intercreditor Agreement;

(f)      On March 4, 2009, the Trustee under the Stark TD conducted a trustee's sale of the 60% interest in the Property and all other property encumbered by the Stark TD.  Stark acquired the 60% interest in the Property and all other property encumbered by the Stark TD free and clear of the lien of the Stradella TD with a partial credit bid of $20 million and thereby extinguished the lien of the Stradella TD upon the 60% interest in the Property by operation of law 60%, together with all claims, rights, interests, encumbrances, liens and other matters affecting title to the 60% interest in the Property subordinate in priority to the lien of the Stark TD.  Upon recordation of that certain Trustee's Deed Upon Sale and Bill of Sale, dated March 4, 2009, as Instrument Number 2009-0115144 in the Official Records of Riverside County on March 11, 2009, Stark acquired record and beneficial ownership of the 60% interest in the Property and all other property encumbered by the Stark TD free and clear of the lien of the Stradella TD; and

(g)      Neither Stark nor the 60% interest in the Property now vested in Stark is subject to, bound, burdened, encumbered or in any manner or to any to extent, nor affected by, the lien of the Stradella TD.

Gibson, Dunn &
Crutcher LLP

**FIFTH CAUSE OF ACTION**

**DECLARATORY RELIEF: STARK TOOK "FREE & CLEAR" OF THE STRADELLA TD**

88.     Plaintiff hereby repeats and realleges each and all of the allegations contained in paragraphs 1 through 79, inclusive, and incorporates them herein by reference with the same force and effect as if set forth in full herein.

89.     An actual controversy now exists between Plaintiff and the Chapter 11 Trustee as to the purported existence of the Stradella TD and any rights of the Estate or the Debtor under the Stradella TD to enforce payment of any obligation formerly secured thereby.  This controversy directly and adversely affects the 60% interest in the Property and clouds title to the 60% interest in the Property now vested in Plaintiff.  Stark is entitled to a final judgment quieting title in and to the 60% interest in the Property in Stark against the Chapter 11 Trustee and all right, title, interest, claim and estate held by the Chapter 11 Trustee in the Estate or otherwise vested in the Chapter 11 Trustee under the United States Bankruptcy Code and applicable non-bankruptcy law, in favor of Stark finding and declaring each and all of the following:

(a)     An actual controversy now exists as the Chapter 11 Trustee has asserted in the Status Report that Plaintiff "is the current owner of the 60% tenant in common interest in the Property, *subject to the Note secured by the First DOT*." (*Emphasis added.*).  Plaintiff Stark maintains that the lien of the Stradella TD was extinguished on March 4, 2009.

(b)     During the period commencing upon May 15, 2006 and ending on March 19, 2008, in violation of section 5(a) of the Intercreditor Agreement, Stradella entered into one or more deferrals of the so-called "First Loan" and thereby amended the payment terms of the indebtedness evidenced by the Stradella Note without obtaining the written consent of by Stark.  Each of the three deferrals of the indebtedness evidenced by the Stradella Note without the written consent by Stark constitutes (i) a First Loan Modification within the meaning of the Intercreditor Agreement and (ii) a material breach of the Intercreditor Agreement by Stradella;

(c)     As early as May 15, 2006, but in no event later than March 19, 2008, as of and upon the respective execution and delivery of each of the Second Amendment, the Third

Amendment and the Fourth Amendment, the lien of the Stradella TD thereupon ceased to be a lien upon the 60% interest in the Property senior in priority to the lien of the Stark TD as expressly provided and agreed by the parties to the Intercreditor Agreement with respect to any First Loan Modification entered into in violation of section 5(a) of the Intercreditor Agreement;

(d)    As early as May 15, 2006, but in no event later than March 19, 2008, as of and upon the respective execution and delivery of each of the Second Amendment, the Third Amendment and the Fourth Amendment, the lien of the Stark TD thereupon became a lien upon the 60% interest in the Property senior in priority to the lien of the Stradella TD which thereupon and thereby became subject and subordinate to the lien of the Stark TD in its entirety as expressly provided and agreed by the parties to the Intercreditor Agreement with respect to any First Loan Modification entered into in violation of section 5(a) of the Intercreditor Agreement;

(e)    On and as of March 4, 2009, the lien of the Stradella TD was and remained subject and subordinate to the lien of the Stark TD in its entirety as expressly provided and agreed by the parties to the Intercreditor Agreement with respect to any First Loan Modification entered into in violation of section 5(a) of the Intercreditor Agreement;

(f)    On March 4, 2009, the Trustee under the Stark TD conducted a trustee's sale of the 60% interest in the Property and all other property encumbered by the Stark TD.  Stark acquired the 60% interest in the Property and all other property encumbered by the Stark TD free and clear of the lien of the Stradella TD with a partial credit bid of $20 million and thereby extinguished the lien of the Stradella TD upon the 60% interest in the Property by operation of law, together with all claims, rights, interests, encumbrances, liens and other matters affecting title to the 60% interest in the Property subordinate in priority to the lien of the Stark TD.  Upon recordation of that certain Trustee's Deed Upon Sale and Bill of Sale, dated March 4, 2009, as Instrument Number 2009-0115144 in the Official Records of Riverside County on March 11, 2009, Stark acquired record and beneficial ownership of the

Gibson, Dunn &
Crutcher LLP

60% interest in the Property and all other property encumbered by the Stark TD free and clear

of the lien of the Stradella TD; and

(g)    Neither Stark nor the 60% interest in the Property now vested in Stark is

subject to, bound, burdened, encumbered or in any manner or to any to extent, nor affected

by, the lien of the Stradella TD.

## SIXTH CAUSE OF ACTION

## DECLARATORY RELIEF: SUBORDINATION AND EXTINGUISHMENT OF LIEN
## SECURING PAYMENT OF INTEREST

90.    Plaintiff hereby repeats and realleges each and all of the allegations contained in

paragraphs 1 through 79, inclusive, and incorporates them herein by reference with the same force

and effect as if set forth in full herein.

91.    An actual controversy now exists between Plaintiff and the Chapter 11 Trustee as to

the purported existence of the Stradella TD and any rights of the Estate or the Debtor under the

Stradella TD to enforce payment of interest or any other obligation formerly secured thereby.  This

controversy directly and adversely affects the 60% interest in the Property and clouds title to the 60%

interest in the Property now vested in Plaintiff.  Stark is entitled to a final judgment and decree

against the Chapter 11 Trustee and all right, title, interest, claim and estate held by the Chapter 11

Trustee in the Estate or otherwise vested in the Chapter 11 Trustee under the United States

Bankruptcy Code and applicable non-bankruptcy law, finding and declaring each and all of the

following:

(a)    An actual controversy now exists as the Chapter 11 Trustee claimed in the Status

Report that "Under the terms of the PSA and Note, the $25 million dollar Note starts to accrue

interest on September 30, 2013."  Plaintiff asserts that the interest accrual date of September 30, 2013

is based upon a "First Loan Modification" entered into by Stradella in breach of the Intercreditor

Agreement, thereby rendering the lien of the Stradella TD subordinate to the Stark TD under the

express terms of the Intercreditor Agreement.  Plaintiff Stark maintains that Plaintiff's subsequent

exercise of the power of sale under the Stark TD extinguished any right of the Estate or the Debtor to

Gibson, Dunn &
Crutcher LLP

1  enforce the payment of interest secured by such inferior lien by operation of law upon the 60%

2  interest in the Property now vested in Plaintiff on March 4, 2009.

3          (b)       During the period commencing upon May 15, 2006 and ending on March 19,

4  2008, Stradella materially changed, amended, modified, deferred, postponed and otherwise

5  altered the terms governing the accrual and payment of interest upon the indebtedness

6  evidenced by the Stradella Note without obtaining the written consent of Stark in violation of

7  section 5(a) of the Intercreditor Agreement;

8          (c)       Each and all of such changes, amendments, modifications, deferrals,

9  postponements and alterations of the terms governing the accrual and payment of interest

10  upon the so-called "First Loan" without the written consent by Stark constitutes (i) a "First

11  Loan Modification" within the meaning of the Intercreditor Agreement to the extent of any

12  obligation to pay interest upon the unpaid principal balance of the Stradella Note and (ii) a

13  material breach of the Intercreditor Agreement by Stradella;

14          (d)       As early as May 15, 2006, but in no event later than March 19, 2008, as of and

15  upon the respective execution and delivery of each of the Second Amendment, the Third

16  Amendment and the Fourth Amendment, the lien of the Stradella TD thereupon ceased to be a

17  lien on the 60% interest in the Property senior in priority to the lien of the Stark TD to the

18  extent the Stradella TD theretofore had secured the obligation to pay interest upon the unpaid

19  principal balance of the Stradella Note, all as expressly provided and agreed by the parties to

20  the Intercreditor Agreement with respect to any First Loan Modification entered into in

21  violation of section 5(a) of the Intercreditor Agreement;

22          (e)       As early as May 15, 2006, but in no event later than March 19, 2008, as of and

23  upon the respective execution and delivery of each of the Second Amendment, the Third

24  Amendment and the Fourth Amendment, the lien of the Stark TD thereupon became a lien on

25  the 60% interest in the Property senior in priority to the lien of the Stradella TD to the extent

26  the Stradella TD theretofore had secured the obligation to pay interest upon the unpaid

27  principal balance of the Stradella Note, and the lien of the Stradella TD thereupon became

28  subject and subordinate to the lien of the Stark TD to the extent the Stradella TD theretofore

had secured the obligation to pay interest upon the unpaid principal balance of the Stradella Note, as expressly provided and agreed by the parties to the Intercreditor Agreement with respect to any First Loan Modification entered into in violation of section 5(a) of the Intercreditor Agreement;

(f)      On and as of March 4, 2009, the lien of the Stradella TD was and remained subject and subordinate to the lien of the Stark TD to the extent the Stradella TD theretofore had secured the obligation to pay interest upon the unpaid principal balance of the Stradella Note, all as expressly provided and agreed by the parties to the Intercreditor Agreement with respect to any "First Loan Modification" entered into in violation of section 5(a) of the Intercreditor Agreement; and

(g)      On March 4, 2009, the Trustee under the Stark TD conducted a trustee's sale of the 60% interest in the Property and all other property encumbered by the Stark TD.  Stark acquired the 60% interest in the Property and all other property encumbered by the Stark TD free and clear of the lien of the Stradella TD with a partial credit bid of $20 million and, to the extent the Stradella TD theretofore had secured the obligation to pay interest upon the unpaid principal balance of the Stradella Note, by operation of law forever extinguished the lien of the Stradella TD upon the 60% interest in the Property as a matter of law, together with all claims, rights, interests, encumbrances, liens and other matters affecting title to the 60% interest in the Property subordinate in priority to the lien of the Stark TD;

(h)      Upon recordation of that certain Trustee's Deed Upon Sale and Bill of Sale, dated March 4, 2009, as Instrument Number 2009-0115144 in the Official Records of Riverside County on March 11, 2009, Stark acquired record and beneficial ownership of the 60% interest in the Property and all other property encumbered by the Stark TD free and clear of the lien of the Stradella TD to the extent the Stradella TD theretofore had secured the obligation to pay interest upon the unpaid principal balance of the Stradella Note.

Gibson, Dunn &
Crutcher LLP

1

### SEVENTH CAUSE OF ACTION

2

### DECLARATORY RELIEF: NO INTEREST OF THE ESTATE IN FUTURE PROFITS

3        92.    Plaintiff hereby repeats and realleges each and all of the allegations contained in

4    paragraphs 1 through 79, inclusive, and incorporates them herein by reference with the same force

5    and effect as if set forth in full herein.

6        93.    An actual controversy now exists between Plaintiff and the Chapter 11 Trustee as to

7    the existence of an ongoing right of the Debtor or the Estate to a share of future income and profits

8    generated by the 60% interest in the Property now vested in Plaintiff.  This controversy directly and

9    adversely affects the 60% interest in the Property and clouds title to the 60% interest in the Property

10    now vested in Plaintiff.  Stark is entitled to a final judgment and decree against the Chapter 11

11    Trustee and all right, title, interest, claim and estate held by the Chapter 11 Trustee in the Estate or

12    otherwise vested in the Chapter 11 Trustee under the United States Bankruptcy Code and applicable

13    non-bankruptcy law, in favor of Stark, quieting title in and to the 60% interest in the Property in Stark

14    finding and declaring each and all of the following:

15        (a)    An actual controversy now exists as the Chapter 11 Trustee has asserted in the

16        Status Report the possible existence of an ongoing right of the Debtor and/or the Estate to a

17        share of future income and profits generated by the Property.

18        (b)    The claim asserted by the Trustee is entirely lacking in merit.  The

19        Subordination and Standstill Agreement absolutely and forever subordinated the lien of the

20        Third TD and each and all of the PSA, all of the other documents or instruments executed or

21        delivered in connection with the PSA, therewith, including without limitation, the

22        Participation Agreement (and the Memorandum of Participation Agreement), the Purchase

23        Agreement Memorandum and the Hotel Agreement to the lien of the Stark TD;

24        (c)    At all times from and after March 14, 2006, the Subordination Agreement

25        rendered the Stark TD absolutely and forever unconditionally senior and superior to *each and*

26        *every* one of:

27            The Purchase and Sale Agreement

28            The Participation Agreement

The Hotel Agreement

The Third TD

Memorandum of Participation Agreement recorded as Instrument Number
2006-0181834

Memorandum of Agreement Concerning Hotel recorded as Instrument Number
2006-0181835

Memorandum of Purchase and Sale Agreement recorded as Instrument
Number 2006-149387

Any and all liens, rights, duties, obligations, interests, claims and privileges arising under
any of the foregoing or evidenced thereby;

(d)     As of March 4, 2009, each and all of the "Purchase and Sale Agreement and all
of the other documents or instruments executed or delivered in connection therewith", the
Participation Agreement, the Hotel Agreement, the Third TD, that certain Memorandum of
Participation Agreement recorded as Instrument Number 2006-0181834, that certain
Memorandum of Agreement Concerning Hotel, as Instrument Number 2006-0181835, and
that certain Memorandum of Purchase and Sale Agreement recorded as Instrument Number
2006-149387, together with all liens rights, duties, obligations, interests, claims and privileges
arising under any of the foregoing or evidenced thereby, were absolutely junior and
subordinate to the lien of the Stark TD and to payment in full of the Stark Note;

(e)     On March 4, 2009, the Trustee under the Stark TD conducted a trustee's sale
of the 60% interest in the Property and all other property encumbered by the Stark TD.  Stark
thereupon and thereby acquired the 60% interest in the Property and all other property
encumbered by the Stark TD with a partial credit bid and thereby fully and forever
extinguished, by operation of law, the lien of the Third TD and each and all of the "Purchase
and Sale Agreement and all of the other documents or instruments executed or delivered in
connection therewith", the Participation Agreement, the Hotel Agreement, that certain
Memorandum of Participation Agreement recorded as Instrument Number 2006-0181834,
that certain Memorandum of Agreement Concerning Hotel, as Instrument Number 2006-

0181835, and that certain Memorandum of Purchase and Sale Agreement recorded as Instrument Number 2006-149387, together with all liens, rights, duties, obligations, interests, claims and privileges arising under any of the foregoing or evidenced thereby and any and all other matters affecting title to the 60% interest in the Property then subordinate in priority to the lien of the Stark TD;

(f)    Upon recordation of that certain Trustee's Deed Upon Sale and Bill of Sale, dated March 4, 2009, as Instrument Number 2009-0115144 in the Official Records of Riverside County on March 11, 2009, as a matter of law and by operation of law, Stark acquired record and beneficial ownership of the 60% interest in the Property and all other property encumbered by the Stark TD free and clear of each and all of the Third TD, the "Purchase and Sale Agreement and all of the other documents or instruments executed or delivered in connection therewith", the Participation Agreement, the Hotel Agreement, that certain Memorandum of Participation Agreement recorded as Instrument Number 2006-0181834, that certain Memorandum of Agreement Concerning Hotel, as Instrument Number 2006-0181835, and that certain Memorandum of Purchase and Sale Agreement recorded as Instrument Number 2006-149387, together with all liens arising therein, all rights, duties, obligations, interests, claims and privileges arising under or evidenced by any of the foregoing, as well as each and every other claim, right, interest, encumbrance, lien or matter affecting title to the 60% interest in the Property then subordinate in priority to the lien of the Stark TD, subject only to the Commercial Parcel Agreement; and

(g)    Neither Stark nor the 60% interest in the Property now vested in Stark is subject to, bound, burdened, encumbered or in any manner or to any to extent, nor affected by any of:

The Purchase and Sale Agreement

The Participation Agreement

The Hotel Agreement

The Third TD

1    Memorandum of Participation Agreement recorded as Instrument Number

2    2006-0181834

3    Memorandum of Agreement Concerning Hotel recorded as Instrument Number

4    2006-0181835

5    Memorandum of Purchase and Sale Agreement recorded as Instrument

6    Number 2006-149387

7    Any and all liens, rights, duties, obligations, interests, claims and privileges

8    arising under any of the foregoing or evidenced thereby.

9    **EIGHTH CAUSE OF ACTION**

10    **FOR INJUNCTIVE RELIEF**

11    94.    Plaintiff hereby repeats and realleges each and all of the allegations contained in

12    paragraphs 1 through 79, inclusive, and incorporates them herein by reference with the same force

13    and effect as if set forth in full herein.

14    95.    Stark is entitled to interim and permanent injunctive relief forever barring and

15    restraining each of the Chapter 11 Trustee, the Debtor and the Estate, together with each and every

16    person or entity claiming by or through the Debtor and/or the Estate, both during the pendency of this

17    proceeding and at all times and from time to time thereafter on a permanent and perpetual basis, from

18    enforcing, exercising or otherwise seeking to enforce or exercise any right, lien, privilege or remedy,

19    and from any act to exercise or enforce any right, lien, privilege or remedy, arising under, in

20    connection with, in respect of or otherwise available under applicable state or federal law, and

21    whether legal, equitable, judicial, statutory or arising by common law, against any of Stark, its

22    successors and assigns, or the 60% interest in the Property, to the extent any such  right, lien,

23    privilege or remedy is evidenced by or relates to any or all of: the Purchase and Sale Agreement and

24    all of the other documents or instruments executed or delivered in connection therewith (excluding

25    therefrom, *solely*, the Commercial Parcel Agreement); the Participation Agreement; the Hotel

26    Agreement; the Third TD; Memorandum of Participation Agreement recorded as Instrument Number

27    2006-0181834; Memorandum of Agreement Concerning Hotel as Instrument Number 2006-0181835;

28

Gibson, Dunn &
Crutcher LLP

Memorandum of Purchase and Sale Agreement recorded as Instrument Number 2006-149387; and

the Stradella TD.


### PRAYER

Wherefore, Plaintiff Stark prays for judgment as follows:

1.     For specific performance, quiet title, declaratory relief and injunctive relief as detailed

above;

2.     For payment to Stark by the Estate of all attorneys' fees and costs incurred by Stark in

connection with enforcement of each of the Intercreditor Agreement and the

Subordination and Standstill Agreement to the maximum extent permitted by

California law; and

3.     For such other and further relief, including costs and expenses, as this Court may

deem just and proper.


Dated: September 9, 2013

                                   DENNIS B. ARNOLD
                                   JEFFREY C. KRAUSE
                                   PETER S. BACH-Y-RITA
                                   GIBSON, DUNN & CRUTCHER LLP


                                   By:   /s/ Jeffrey C. Krause
                                         Dennis B. Arnold
                                         Jeffrey C. Krause
                                         Peter Bach-y-Rita

                                   Attorneys for Plaintiff Stark RM Eagle, LLC

101576049.1

FORM B104  (08/07)                                                              2007 USBC, Central District of California

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Page 2) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>STARK RM EAGLE LLC | DEFENDANTS<br>RICHARD A. MARSHACK, AS CHAPTER 11 TRUSTEE OF<br>STRADELLA INVESTMENTS, INC. |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Dennis B. Arnold, Jeffrey C. Krause & Peter Bach-y-Rita<br>Gibson, Dunn & Crutcher LLP, 333 South Grand Avenue<br>Los Angeles, CA 90071-3197 | ATTORNEYS (If Known)<br>D. Edward Hays & Kristine A. Thagard<br>Marshack Hays LLP, 870 Roosevelt Avenue<br>Irvine,  CA 92620 |
| PARTY (Check One Box Only)<br>☐ Debtor      ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor    ☑ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☑ Debtor      ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor    ☐ Other<br>☐ Trustee |

| CAUSE OF ACTION (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)<br>Complaint for specific performance, quiet title, declaratory relief and injunctive relief. |
|---|

**NATURE OF SUIT**
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
[1] 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
[4] 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
[2] 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
[3] 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $ |

| Other Relief Sought<br>1) Specific performance<br>2) Quiet title<br>3) Declaratory relief<br>4) Injunctive relief |
|---|

FORM B104 (08/07), page 2                                          2007 USBC, Central District of California

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Stradella Investments, Inc. | | BANKRUPTCY CASE NO.<br>10-23193 |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISIONAL OFFICE<br>Santa Ana | NAME OF JUDGE<br>Catherine E. Bauer |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>*JCKrause* | | |
| DATE<br>9/9/13 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Jeffrey C. Krause | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits concerning the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendents.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not presented by an attorney, the plaintiff must sign.

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| *Attorney for Plaintiff* | |

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA - _____ DIVISION

| In re: | CASE NO.: |
|---|---|
| | CHAPTER: |
| Debtor(s). | ADVERSARY NUMBER: |
| Versus                    Plaintiff(s) | **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING  [LBR 7004-1]** |
| Defendant(s) | |

TO THE DEFENDANT:  A Complaint has been filed by the Plaintiff against you.  If you wish to defend against the Complaint, you must file with the court a written pleading in response to the Complaint.  You must also serve a copy of your written response on the party shown in the upper left-hand corner of this page.  The deadline to file and serve a written response is _____.  If you do not timely file and serve the response, the court may enter a judgment by default against you for the relief demanded in the Complaint.

A status conference in the adversary proceeding commenced by the Complaint has been set for:

**Hearing Date:** _____       **Place:**
**Time:** _____
**Courtroom:** _____
- [ ] 255 East Temple Street, Los Angeles, CA 90012
- [ ] 3420 Twelfth Street, Riverside, CA 92501
- [ ] 411 West Fourth Street, Santa Ana, CA 92701
- [ ] 1415 State Street, Santa Barbara, CA 93101
- [ ] 21041 Burbank Boulevard, Woodland Hills, CA 91367

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*June 2012*                    Page 1                    **F 7004-1.SUMMONS.ADV.PROC**

**You must comply with LBR 7016-1, which requires you to file a joint status report and to appear at a status conference.** All parties must read and comply with the rule, even if you are representing yourself. You must cooperate with the other parties in the case and file a joint status report with the court and serve it on the appropriate parties at least 14 days before a status conference. A court-approved joint status report form is available on the court's website (LBR form F 7016-1.STATUS.REPORT) with an attachment for additional parties if necessary (LBR form F 7016-1.STATUS.REPORT.ATTACH). If the other parties do not cooperate in filing a joint status report, you still must file with the court a unilateral status report and the accompanying required declaration instead of a joint status report 7 days before the status conference. **The court may fine you or impose other sanctions if you do not file a status report. The court may also fine you or impose other sanctions if you fail to appear at a status conference.**


**KATHLEEN J. CAMPBELL**
**CLERK OF COURT**



Date of Issuance of Summons and Notice of Status Conference in Adversary Proceeding: _____



By: _____
                              Deputy Clerk

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*June 2012*                                        Page 2                        **F 7004-1.SUMMONS.ADV.PROC**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

A true and correct copy of the foregoing document entitled: **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004-1]** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>:**  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐ Service information continued on attached page

**2. <u>SERVED BY UNITED STATES MAIL</u>:**
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. <u>SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL</u>** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____     _____
*Date*                    *Printed Name*                                        *Signature*

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*June 2012*                                    Page 3                      **F 7004-1.SUMMONS.ADV.PROC**